IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| John Coble and Robin Coble, on behalf of their minor child "J.H.C.",<br><br>Plaintiffs,<br><br>v.<br><br>Lake Norman Charter School, Inc.; Rick Buckler, Board Chairman; Leslie Fogarty, Board Vice-Chairman; Jared Tilley, Treasurer and Board Member; Stephanie Painter, Secretary and Board Member; Amy Carr, Board Member; Ridgely Chapman, Board Member; Jennifer Johnson, Board Member; Greg Kilpatrick, Board Member; and Elizabeth Timkovich, Board Member,<br><br>Defendants. | **COMPLAINT** |

*The Virgin Mary was "an impregnated virgin who was probably scared shitless."*

*The "parable" of Eve is "bullshit."*

*"[T]he Story of Genesis is Mad Stupid"*

*Everything in the Bible is nothing more than "metaphor"*

*"Jesus feels like … a friend I just don't think I need anymore."*

A public school in this State chose a book containing these statements as part of its curriculum. If Christians were gearing up for war, no reasonably objective observer could blame them. Yet, Defendants perceive no hostility toward Christianity in these and many other similar remarks made by the protagonist in the *Poet X*. In fact,

throughout the entirety of the book, Christianity (Catholicism in particular) is the foil against which the author develops her competing view of how to achieve liberation and fulfillment in life, but more on that in a moment. Plaintiffs hereby challenge Defendants' plan to teach the book to ninth graders as a violation of the First Amendment. The School's plan to teach the book to the young impressionable minds in their public secondary school runs afoul of the most basic precept underpinning the Religion Clauses – that government must remain neutral in matters of religion and is certainly forbidden from promoting or endorsing materials that exhibit hostility toward any particular religion.

As demonstrated more fully below, the above-quoted excerpts from the book are not isolated or incidental or taken out of context. Such hostile expressions, and a more general hostility to Christianity, pervade the book. Indeed, a complete reading of the book reveals to any reasonably objective observer that the book tears down Christianity in the service of constructing another alternative to finding liberation and meaning in life. It is frankly impossible to miss that message. The book's structure and the arc of the story (including the crisis, the crescendo, and the denouement) all point directly and unmistakably in that direction. There can simply be no question that the book's frontal assault on Christian beliefs and values, and its promotion of an alternative path to liberation and meaning, is *the* central message, regardless of whether we call it a "coming of age" book or anything else.

While the forgoing is certainly sufficient standing alone to invalidate a public school's decision to teach the book to ninth-graders, it bears noting that the book

compounds its assault on Christianity greatly, not only by expressing consistent and overt hostility and derision toward the religion, but also by co-opting Christian beliefs and Scriptures at virtually every step in an effort to support and substantiate the book's proffered alternative path to meaning and liberation in life. A reasonably objective observer can only reach one conclusion: this book most certainly engenders – intentionally and without apology – the divisive forces that the First Amendment was designed to protect against. The book's overt hostility toward Christianity in favor of another approach to liberation and meaning has no place in the public schools.

## JURISDICTION AND VENUE

1. Plaintiffs bring this action under 28 U.S.C. § 1983, 28 U.S.C. § 2201, Rule 57 of the Federal Rules of Civil Procedure, and the Religion Clauses of the First Amendment to the United States Constitution. Plaintiffs seek a declaratory judgment and injunctive relief.

2. Venue is proper under 28 U.S.C. § 1391(b)(1), (2), as (a) one or more of the Defendants resides in this judicial district and all Defendants are on information and belief residents of this judicial district, and (b) a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

3. The Court may exercise personal jurisdiction over the Defendants consistent with Due Process, as all events at issue herein occurred in this judicial district.

4. All requirements of Federal Declaratory Judgment Act are satisfied.

5. There is an actual case or controversy between the Parties and the implementation of the School's decision to the teach the *Poet X* and the attendant constitutional violation are sufficiently imminent for this Court to exercise jurisdiction over this matter.

## **PARTIES**

6. John Coble is a citizen and resident of Mecklenburg County, North Carolina. He is the father and thus the legal guardian of his minor child, "J.H.C.," on whose behalf he brings this lawsuit.

7. Robin Coble is a citizen and resident of Mecklenburg County, North Carolina. She is John Coble's wife and is the mother and thus the legal guardian of her minor child, "J.H.C." Mrs. Coble joins with her husband, Mr. Coble, in bringing this action on behalf of her minor son.

8. "J.H.C." is Mr. and Mrs. Coble's minor child. He is a ninth-grader at Lake Norman Charter and is subject to the reading plan instituted by the School that involves teaching the *Poet X*.

9. On information and belief, Defendant Lake Norman Charter School, Inc. is a non-profit organization created and existing for the purpose of operating a charter school in Mecklenburg County. On information and belief, the School's registered address is 12435 Old Statesville Road, Huntersville, NC 28078.

10. In North Carolina, charter schools like Defendant Lake Norman Charter "are public schools of choice that are authorized by the State Board of Education and operated by independent non-profit boards of directors. State and local

tax dollars are the primary funding sources for charter schools …." https://www.dpi.nc.gov/students-families/innovative-school-options/charter-schools.

11. On information and belief, Defendant Rick Buckler, is a citizen and resident of Mecklenburg County, is the Chairman of the School's Board of Directors, and is named as a party in that capacity.

12. On information and belief, Defendant Leslie Fogarty, is a citizen and resident of Mecklenburg County, is the Vice-Chairman of the School's Board of Directors, and is named as a party in that capacity.

13. On information and belief, Defendant Jared Tilley is a citizen and resident of Mecklenburg County, is the Treasurer for the School, is a member of the School's Board of Directors, and is named as a party in that capacity.

14. On information and belief, Defendant Stephanie Painter is a citizen and resident of Lincoln County, is the Secretary for the School, is a member of the School's Board of Directors, and is named as a party in that capacity.

15. On information and belief, Defendant Amy Carr is a citizen and resident of Cabarrus County, is a member of the School's Board of Directors, and is named as a party in that capacity.

16. On information and belief, Defendant Ridgely Chapman is a citizen and resident of Mecklenburg County, is a member of the School's Board of Directors, and is named as a party in that capacity.

17. On information and belief, Defendant Jennifer Johnson is a citizen and resident of Mecklenburg County, is a member of the School's Board of Directors, and is named as a party in that capacity.

18. On information and belief, Defendant Greg Kilpatrick is a citizen and resident of Mecklenburg County, is a member of the School's Board of Directors, and is named as a party in that capacity.

19. On information and belief, Defendant Elizabeth Timkovich is a citizen and resident of Mecklenburg County, is a member of the School's Board of Directors, and is named as a party in that capacity.

## **FACTS**

20. The School plans to teach the *Poet X* as part of its ninth-grade curriculum.

21. The book, styled as "coming of age" story told in the genre of contemporary poetry, is an overtly religious book, with overtly religious themes and messaging.

22. The book is also openly and overtly hostile to Christianity. Indeed, Christianity is the constant foil against which the protagonist of the *Poet X* develops the message that the individual can be "like or as God," as the book ultimately declares.

23. The book's structure is the first unmistakable signal from the author that the book deals with overtly religious topics. Specifically, the book is structured in three parts:

a. Part I: In the Beginning Was the Word;

b. Part II: And the Word Was Made Flesh; and

c. Part III: The Voice of One Crying in the Wilderness.

24. The book's structure thus immediately reveals its juxtaposition to Christianity, as each of the above titles corresponds to a well-known verse in John Chapter 1:

a. "In the beginning was the Word …" John 1:1.

b. "The Word became flesh …" John 1:14.

c. "I am the voice of one crying in the wilderness …" John 1:23.

25. The arc of the story also confirms the religious nature of the book's message and its hostility to Christianity:

a. At pages 12-13, the book contains a poem titled "Confirmation Class" wherein the protagonist tells us that "Jesus feels like a friend … who invites himself over too often, who texts me too much. *A friend I just don't think I need anymore.*" pp. 12-13.

b. One page later, a poem captioned "GOD" declares that "… church treats a girl like me differently. Sometimes it feels all I'm worth is under my skirt and not between my ears." 14.

c. Six pages later, the protagonist – speaking of religious practices regularly observed by devout Catholics – declares that "[y]ou will learn to hate it." 20-21.

d. Another poem, following shortly thereafter and captioned "First Confirmation Class," states "I'd rather be anywhere but here." 24.

e. Other early poems speak of teachings about freely and voluntarily accepting Christ as "a fruit I've never tasted that's already gone sour in my mouth," p. 26; refer to "stuffy-ass church mission friends," p. 29; and declare (in a poem titled "On Sunday") that "these days, church seems less party and more prison." p. 55.

f. In a poem titled "Church Mass," the protagonist states that "when Father Sean starts talking about the Scriptures … everything inside of me feels like a too-full, too-dirty kitchen sink." p. 58.

g. That same poem refers to the Virgin Mary as "an impregnated virgin who was probably scared shitless" and compares Christianity to a house that she "no longer want[s] to rent." p. 59.

h. Shortly thereafter, a poem titled "Holy Water" concludes with the statement that "I don't know if it's prayer to hope that soon my feelings will drown me faster than the church's baptismal water." p. 63.

i. Another poem in the "conflict development" portion of the story discusses the protagonist's thoughts about Communion. The protagonist titles the poem "All Over a Damn Wafer." p. 66.

j. In that poem, the protagonist states: "I can feel the hot eyes of the Jesus statue watching me hide the wafer beneath the bench, where his holy body will now feed the mice." p. 66.

k. All of the forgoing takes place, and the author has only reached page sixty-six of a 357-page book.

l. Later, speaking of a boy she likes, the protagonist states that "in my dreams his is a mouth that knows more than curses and prayers. More than bread and wine. More than water. More than blood. More." pp. 85-86.

m. Any reasonably objective and informed reader would understand the author's use of Christian religious imagery and themes in the preceding passage and would understand that the protagonist is communicating to the reader that the promise of fleshly indulgence and individuality is "more" than the offers of Christianity – the bread, the wine, the water, and ultimately the blood. There's actually no other way to read it, especially in light of the book's ultimate conclusion, which shall be addressed momentarily.

n. In the meantime, at page 117, the author presents a poem stating: "[A]lthough I still want to stay seated during Communion, I get up every time, put the wafer in my mouth then slip it beneath the pew. My hands shaking less and less every time I do." p. 118. She is growing more comfortable in her rejection of Christianity.

o. In the very next passage the protagonist tells us that the Genesis story "all just seems like bullshit. So I say so. Out loud. To Father Sean." p. 119. She is increasingly bold in expressing her rejection of Christianity.

p. She titles the poem that follows "I think the Story of Genesis is Mad Stupid." p. 120. Among other things, the poem expresses the belief that everything in the Bible is simply a metaphor (a belief to which she returns in the book's concluding entry).

q. Later in the story, after discovering poetry, the protagonist states: "Tuesday [the day the poetry club meets] has become my equivalent to Mami's Sunday. A prayer circle." p. 283.

r. Mami is the maternal figure in the book whom I believe any reasonably objective reader would understand represents the embrace of Christianity as a source of finding liberation and meaning in life.

s. On information and belief, based on the structure and arc of the story, the juxtaposition between Christianity and individualism is intentionally presented in stark and explicit terms.

t. In the book's crescendo, mother (Mami) and daughter (Xiamara – the Poet "X") finally have it out.

u. The author describes the altercation in a poem titled "If Your Hand Causes You to Sin." pp. 304-05. Any reasonably objective reader would understand the title as a reference to Mami's belief that the individuality represented in the poetry of the protagonist separates her from God and thus constitutes sin.

v. In giving the details of the actual physical altercation between the two, the author tells us that the mother "recites Scripture" while the daughter recites "memorized verses from her own poems and stanzas." p. 305. Again, the juxtaposition between Christianity and individualism is on full, unapologetic display, as any reasonably objective and informed reader will understand.

w. If there could even possibly be any doubt about that, the protagonist tells us on the very next page that one of the memorized verses the she recites from her poetry during the altercation declares that she raises her hands "to build the church of myself." pp. 306-07.

x. In the poems that follow and lead up to the book's conclusion, the protagonist expresses that "God just wants me to behave so I can earn being alive. But what about me? What about Xiomara?" p. 333. She also tells us that her poems are about her own individuality: "All my poems are personal…. They're about me." p. 344.

y. Finally, the book concludes. In its concluding entry, the book uses Psalm 119:130 as a prologue: "The unfolding of your words gives me light; it gives understanding to the simple." p. 356. In the second sentence of that entry, the protagonist declares that "[t]he weird thing about the Bible is that almost everything in it is a metaphor." Shortly thereafter she states, with respect to her conception of God, that "he or she is a comparison to us. I think we are all like or as God."

z. This final entry also expresses the belief that the Psalm in the prologue refers to "any of the words that bring us together" and that real liberation lies "in the power of my own words."

26. The teaching and conclusion of the book is diametrically opposed to the most fundamental Christian teaching. A reasonably objective and informed reader will understand that.

27. Specifically, the lesson of the book, as expressly declared by the author in the book's conclusion, is that "we are all like or as God" and that we can finding

meaning and liberation apart from the Christian understanding of God "in the power of [our] own words."

28. The book's most fundamental teaching thus mirrors the serpent's temptation of Eve in the Garden of Eden in Genesis Chapter 3: Declare your independence from God, said the serpent – rebel against Him and find your own path, your own knowledge of good and evil, your own wisdom – and "your eyes will be opened, and *you will be like God.*" Genesis 3:5 (emphasis added).

29. So too does the book teach that, we are able to look to the "the power of [our] own words," and that "*we are all like or as God.*" A reasonably objective and informed reader will understand the parallel. In fact, to the reasonably objective and informed reader, it's impossible to miss.

30. And so it is, that having earlier called the "parable" of Eve "bullshit," the author returns to the Garden of Eden (Genesis Chapter 3) in the book's finale and declares the serpent the victor. We're no longer made in God's image, He's made in ours. p. 356 ("I don't know what, who, or where God is. But if everything is a metaphor, I think he or she is a comparison to us. I think we are all like or as God."). And as independent god-deities, we can trust and rely on our "own words" to give us the "most freeing experience …." That's an overtly religious statement. In fact, if that's not a religious statement it's difficult to imagine one.

31. And it's contrary in every way to the traditional Christian beliefs the protagonist consistently shuns and degrades throughout the book. The reasonably objective and informed reader will understand this fact.

Page 13 of 19
Complaint
Coble/Lake Norman

32.  The book's contradiction of Christianity is no trivial matter. A reasonably objective and informed reader will understand that the Christian doctrine at issue is nothing less than the Christian's conception of temptation and original sin. The question of man's relationship to himself, to the world, and to his God.

33.  The book takes a position on that religious, theological question and does so explicitly at Christianity's expense.

34.  There really is no other reasonably objective or informed way to read the book. The author herself left us no interpretive wiggle room. The book's conclusion tells us explicitly what was already apparent enough – that the whole point of the book is the triumph of individualism over traditional Christian teachings and beliefs when it comes to matters of liberation, meaning, and fulfillment.

35.  Plaintiffs, as the parents of the minor child "J.H.C." and on his behalf, have objected to the School's plan to teach the *Poet X*.

36.  Plaintiffs presented their objections and concerns to the School Board and to the proper School officials, but the School Board refused Plaintiffs' request that the *Poet X* be dropped from the curriculum.

37.  Attached hereto as Exhibit A is a copy of an email Plaintiffs obtained, which, on information and belief, is a form email that the School is sending to anyone who contacts the school with questions about the School's decision to use the book.

38.  According to the email, the School made and stuck by the decision to teach the *Poet X* in an effort to present to students "diverse thought and a range of opinions and perspectives to expand our awareness, stretch our thinking and

ultimately help us grow as a school" in an effort to "prepare [students] for life after graduation."

39. As the email further explains, the point of the selections is to help the students grapple with, and ultimately answer, some of life's ultimate questions, such as questions about the students' "own identity in relation to the world."

40. While the email states that "teachers guide the students with intelligent academic discussion" of each selection, the concluding paragraph makes plain that the primary objective of the selections, particularly as related to literature, is not an objective academic presentation of the intellectual tenets or practices of competing viewpoints.

41. Rather, "preparing our students for success beyond high school *goes well outside of strictly academic readiness* and extends to introducing them to different thoughts and ideas, oftentimes through literature; books allow our students to access a world different from theirs and "meet" people, of varied backgrounds, races, ethnicities, experiences, social-economic circumstance and more. To send our graduates off into a world without this preparation can lead to the same ending as sending them off ill-equipped academically. What students can learn through literature and subsequent conversations with informed peers and teachers, is invaluable as they grow to be critical thinkers and well-rounded members of our society." (emphasis added).

42. The School's decision to teach the *Poet X* is not about academics. In the words of the email, the School's choice of literature and its perception of its mission

"goes well beyond" strict academics. The choices are part of the School's attempt to provide a character education to students that will "prepare students for life after graduation" by helping students discern their "identity in relation to the world" and enabling them to relate successfully to a diverse world beyond the walls of the schoolhouse.

43. All of which sounds fantastic in an email, until we take a closer look at what's going on and understand that the School is treading all over the First Amendment in its effort.

## FOR A FIRST CAUSE OF ACTION
**(Declaratory Judgment – First Amendment Violation)**

44. Plaintiffs incorporates into this claim all of the forgoing allegations of the Complaint as if fully stated herein.

45. Plaintiffs bring this action under 28 U.S.C. § 1983, 28 U.S.C. § 2201, Rule 57 of the Federal Rules of Civil Procedure, and the Religion Clauses of the First Amendment to the United States Constitution.

46. The School's decision to teach the *Poet X* in the compulsory setting of a public school violates both the Establishment Clause and the Free Exercise Clause.

47. The primary requirement of the First Amendment Religion clauses is government neutrality. Government cannot take sides in religious matters and cannot show hostility to any particular religion.

48. The School's decision to teach the *Poet X* fails First Amendment scrutiny.

49. The book exhibits overt hostility to Christianity and does so in favor of a competing religious view. The hostility toward Christianity standing alone is sufficient to invalidate the School's decision without further inquiry or analysis, as the Supreme Court has made clear that the Constitution "forbids hostility toward any" religion.

50. To the extent that it may be necessary to go further, however, and to the extent the *Lemon* test may still be good law for assessing Establishment Clause claims, the School's choice to the teach the *Poet X* fails all three prongs of that test.

51. The School's stated purpose of going beyond academics and into character education is not sufficiently secular. Indeed, when the scope of the term "religion" is properly understood, the School's purpose is not secular at all.

52. Furthermore, the primary effect of the School's choice to simultaneously advance one religious view and to inhibit another – indeed to advance one religious view at the expense of the other.

53. The School's decision to teach the book also fosters excessive entanglement because the book has the effect of advancing or inhibiting religion.

54. The School's decision to teach the book also violates the Free Exercise Clause.

55. That Clause prevents government from adopting or implementing policies or practices that are "hostile to the religious beliefs of affected citizens and [government] cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices.

56. The Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion.

57. The School's choice to teach the *Poet X* fails this test. In fact the book's fundamentally religious message is overtly, and not subtly, hostile to Christianity.

58. Given that fact, J.H.C. cannot be put in a situation where his only choices are to accede to the School's choice by either reading the book or opting for an independent study that will remove him from the classroom environment for an extended period.

59. The School's choice constitutes a violation of the First Amendment rights of "J.H.C.", whose parents thus have standing to pursue the claim herein. If the School is permitted to proceed with its plan, implementation of that decision will proximately result in irreparable harm and legally cognizable damages to "J.H.C."

## PRAYER FOR RELIEF

60. Wherefore, the Plaintiffs respectfully request that the Court enter a Temporary Restraining Order and/or Preliminary Injunction precluding the School from teaching the *Poet X* until such time as a determination on the merits can be made;

61. That the Court ultimately declare that the School's decision to teach the *Poet X* offends the Religion Clauses of the Constitution and enter a permanent injunction precluding the School from teaching the book;

62. That in due course, the Court award Plaintiffs their attorneys' fees pursuant to 42 U.S.C. § 1988;

63. That, consistent with Rule 57 and the time-sensitive nature of the School's plan to begin teaching the book in early November, the Court schedule a speedy hearing on the claim and requests for relief herein; and

64. That the Court grant all other relief that it deems just and proper according to law and the facts presented.

This the 27th day of October, 2020.

BONDURANT LITIGATION

s/Joel M. Bondurant, Jr.
JOEL M. BONDURANT, JR.
Attorney for Plaintiffs,
NC Bar No. 29621
15720 Brixham Hill Avenue, Ste. 300
Charlotte, NC 28277
(704) 897-0490 (ph); (704) 559-3379 (fax)
joel@bondurantlawfirm.com