IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| Johnny H. Coble, Jr. and Robin Coble, both on behalf of their minor child "J.H.C.", <br><br> Plaintiffs, <br><br> v. <br><br> Lake Norman Charter School, Inc.; Rick Buckler, Board Chairman; Leslie Fogarty, Board Vice-Chairman; Jared Tilley, Treasurer and Board Member; Stephanie Painter, Secretary and Board Member; Amy Carr, Board Member; Ridgely Chapman, Board Member; Jennifer Johnson, Board Member; Greg Kilpatrick, Board Member; and Elizabeth Timkovich, Board Member, <br><br> Defendants. | Civil Action No. 3:20-cv-00596 <br><br> **MEMORANDUM IN SUPPORT OF AMENDED MOTION FOR TRO AND/OR PRELIMINARY INJUNCTION** |

## <u>INTRODUCTION</u>

*The Virgin Mary was "an impregnated virgin who was probably scared shitless."*

*The "parable" of Eve is "bullshit."*

*"[T]he Story of Genesis is Mad Stupid"*

*Everything in the Bible is nothing more than "metaphor"*

*"Jesus feels like … a friend I just don't think I need anymore."*

A public school in this State chose a book containing these statements as part of its curriculum. If Christians were gearing up for war, no reasonably objective observer could blame them. Yet, Defendants perceive no hostility toward or disparagement of Christianity in these and many other similar remarks made by the

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

Case 3:20-cv-00596-GCM   Document 4-1   Filed 10/29/20   Page 1 of 24

protagonist in the *Poet X*. In fact, throughout the entirety of the book, Christianity (Catholicism in particular) is the foil against which the author develops her competing view of how to achieve liberation and fulfillment in life, but more on that in a moment. Plaintiffs hereby challenge Defendants' plan to teach the book to ninth graders as a violation of the First Amendment. The School's plan to teach the book to the young impressionable minds in their public secondary school runs afoul of the most basic precept underpinning the Religion Clauses – that government must remain neutral in matters of religion and is certainly forbidden from promoting or endorsing materials that exhibit hostility toward or disparagement of any particular religion.

As demonstrated more fully below, the above-quoted excerpts from the book are not isolated or incidental or taken out of context. Such hostile and disparaging expressions, and a more general hostility to and disparagement toward Christianity, pervade the book. Indeed, a complete reading of the book reveals to any reasonably objective observer that the book tears down Christianity in the service of constructing another alternative to finding liberation and meaning in life. It is frankly impossible to miss that message. The book's structure and the arc of the story (including the crisis, the crescendo, and the denouement) all point directly and unmistakably in that direction. And, in the event that any reader were otherwise inclined to miss it, the concluding entry in the book tells us precisely and in unmistakably religious terms what the main point of the story is. There can simply be no question that the book's frontal assault on Christian beliefs and values, and its promotion of an alternative

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

path to liberation and meaning, is *the* central message, regardless of whether we call it a "coming of age" book or anything else.

While the forgoing is certainly sufficient standing alone to invalidate a public school's decision to teach the book to ninth-graders, it bears noting that the book compounds its assault on Christianity greatly, not only by expressing consistent and overt hostility, derision, and disparagement toward the religion, but also by co-opting Christian beliefs and Scriptures at virtually every step in an effort to support and substantiate the book's proffered alternative path to meaning and liberation in life. A reasonably objective observer can only reach one conclusion: this book most certainly engenders – intentionally and without apology – the divisive forces that the First Amendment was designed to protect against. The book's overt hostility toward and disparagement of Christianity in favor of another approach to liberation and meaning has no place in the public schools.

## MOTION FOR TRO/PRELIMINARY INJUNCTION

Plaintiffs hereby move the Court for a temporary restraining order and/or preliminary injunction. *See* Fed. R. Civ. P. 65. In assessing Plaintiffs' request, the Court considers (1) whether Plaintiffs are likely to succeed on the merits; (2) whether Plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief; (3) whether the balance of equities tips in Plaintiffs' favor; and (4) whether an injunction is in the public interest. *See, e.g., Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

Case 3:20-cv-00596-GCM   Document 4-1   Filed 10/29/20   Page 3 of 24

<u>**Likelihood of Success**</u>

<u>**Law: The Touchstone of the Analysis – Government Neutrality**</u>

"The Religion Clauses of the Constitution aim to foster a society in which people of all beliefs can live together harmoniously," *American Legion v. Am. Humanist Ass'n*, 139 S.Ct. 2067, 2074 (2019), and rest "upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere.'" *Barghout v. Bureau of Kosher Meat and Food Control*, 66 F.3d 1337, 1344 (4th Cir. 1995). Accordingly, the most basic requirement of the First Amendment Religion Clauses is neutrality: "The touchstone for our analysis is the principle that the 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.'" *Epperson v. Arkansas*, 393 U. S. 97, 104 (1968); *Everson v. Board of Ed. of Ewing*, 330 U. S. 1, 15-16 (1947). The Court's Religion Clause precedents are informed by the "understanding, reached . . . after decades of religious war, that liberty and social stability demand a religious tolerance that respects the religious views of all citizens ...." *McCreary County v. American Civil Liberties Union of Ky.*, 545 U. S. 844, 860 (2005).

The necessary corollary to the basic requirement of government neutrality in religious matters is that government can take no action that is reasonably perceived to be hostile to or disparaging of any particular religious faith. As the Supreme Court said in *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984), the Constitution "affirmatively mandates accommodation, not merely tolerance, of all religions, and *forbids hostility toward any*." (emphasis added). Neutrality also demands that the government refrain from even subtly coercive activities with respect to religious beliefs. By "ensuring governmental neutrality in matters of religion," *Gillette v. United States*, 401 U.S. 437, 449 (1971), the Religion Clauses safeguard religious liberty and ward off "political

Page 4 of 24

division along religious lines," *Lund v. Rowan Cnty.*, 863 F.3d 268, 275 (4th Cir. 2017) (quoting

*Lemon v. Kurtzman*, 403 U.S. 602, 622, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)). As "instrument[s]

of social peace," the Religion Clauses prevent the government from adopting policies or teaching

materials that "choose[] sides on matters of faith …." *Lund*, 863 F.3d at 275. As the US Supreme

Court summarized the law recently:

> The 'clearest command' of the Establishment Clause is that the Government cannot favor or disfavor one religion over another. *Larson v. Valente*, 456 U.S. 228, 244, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) ("[T]he First Amendment forbids an official purpose to disapprove of a particular religion"); *Edwards v. Aguillard*, 482 U.S. 578, 593, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) ("The Establishment Clause ... forbids alike the preference of a religious doctrine or the prohibition of theory which is deemed antagonistic to a particular dogma" (internal quotation marks omitted)); *Lynch v. Donnelly*, 465 U.S. 668, 673, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (noting that the Establishment Clause "forbids hostility toward any [religion]," because "such hostility would bring us into 'war with our national tradition as embodied in the First Amendmen[t]' "); *Epperson v. Arkansas*, 393 U.S. 97, 106, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) ("[T]he State may not adopt programs or practices ... which aid or oppose any religion. This prohibition is absolute" (citation and internal quotation marks omitted)). Consistent with that clear command, this Court has long acknowledged that governmental actions that favor one religion "inevitabl[y]" foster "the hatred, disrespect and even contempt of those who [hold] contrary beliefs." *Engel v. Vitale*, 370 U.S. 421, 431, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). That is so, this Court has held, because such acts send messages to members of minority faiths " 'that they are outsiders, not full members of the political community.' " *Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290, 309, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000). To guard against this serious harm, the Framers mandated a strict "principle of denominational neutrality." *Larson*, 456 U.S., at 246, 102 S.Ct. 1673; *Board of Ed. of Kiryas Joel Village School Dist. v. Grumet*, 512 U.S. 687, 703, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) (recognizing the role of courts in "safeguarding a principle at the heart of the Establishment Clause, that government should not prefer one religion to another, or religion to irreligion").

*Trump v. Hawaii*, 138 S. Ct. 2392, 2434 (2018).

In another recent case, the Supreme Court continued its theme of neutrality in form of non-

hostility/non-disparagement with respect to the government action under the Religion Clauses:

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

> In *Church of Lukumi Babalu Aye, supra*, the Court made clear that the government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices. The Free Exercise Clause bars even "subtle departures from neutrality" on matters of religion. …. The Constitution "commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures.

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S.Ct. 1719, 1731 (2018) (citations omitted).

With these basic foundational principles in mind, it bears conducting a thorough examination of the *Poet X*, as an understanding of the book's main idea is critical. As will be seen, the book is unmistakably religious - unmistakably hostile toward and disparaging of traditional Christian beliefs. In fact, the author was as explicit and blatant as she could be about it – as revealed by the book's imagery and themes, its structure, the arc of the plot, and the expressly stated conclusion. The author, in effect, told us exactly what the book is about and did so in expressly religious terms and by express reference to Christian Scripture (one of the Psalms).

### **Analysis: Understanding the Unmistakably Religious Main Idea of the *Poet X***

The book is styled as a "coming of age" story told in the genre of contemporary poetry. Whatever label one may hang on it, however, it is an overtly religious book, with overtly religious themes and messaging – themes and messaging that are openly and overtly hostile to and disparaging of Christianity; it's clear enough from even a quick review of the book that the contrast and conflict are intentional. Christianity is the constant foil against which the protagonist of the *Poet X* develops the ultimate message that the individual can be "like or as God," as the book declares in the end.

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

Turning to the full review of the book, its structure is the first unmistakable signal from the author that the book deals with overtly religious topics. It is structured in three parts:

Part I: In the Beginning Was the Word;

Part II: And the Word Was Made Flesh; and

Part III: The Voice of One Crying in the Wilderness.

Each of those titles, of course, corresponds to a well-known verse in Chapter 1 of John's Gospel, and thus revealing the book's juxtaposition to Christianity right out of the gate:

John 1:1: "In the beginning was the Word …"

John 1:14: "The Word became flesh …"

John 1:23: "I am the voice of one crying in the wilderness …"

From that fairly conspicuous invocation of religious references, the reader is not surprised to discover that the arc of the story quickly confirms the religious nature of the book and its hostility toward and disparagement of Christianity:

a.     At pages 12-13, the book contains a poem titled "Confirmation Class" wherein the protagonist tells us that "Jesus feels like a friend … who invites himself over too often, who texts me too much. A friend I just don't think I need anymore." pp. 12-13.

b.     One page later, a poem captioned "GOD" declares that "… church treats a girl like me differently. Sometimes it feels all I'm worth is under my skirt and not between my ears." 14.

c.     Six pages later, the protagonist – speaking of religious practices regularly observed by devout Catholics – declares that "[y]ou will learn to hate it." 20-21.

d.     Another poem, following shortly thereafter and captioned "First Confirmation Class," states "I'd rather be anywhere but here." 24.

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

e.    Other early poems describe teachings about freely and voluntarily accepting Christ as "a fruit I've never tasted that's already gone sour in my mouth," p. 26; refer to "stuffy-ass church mission friends," p. 29; and declare (in a poem titled "On Sunday") that "these days, church seems less party and more prison." p. 55.

f.    In a poem titled "Church Mass," the protagonist states that "when Father Sean starts talking about the Scriptures … everything inside of me feels like a too-full, too-dirty kitchen sink." p. 58.

g.    That same poem refers to the Virgin Mary as "an impregnated virgin who was probably scared shitless" and compares Christianity to a house that she "no longer want[s] to rent." p. 59.

h.    Shortly thereafter, a poem titled "Holy Water" concludes with the statement that "I don't know if it's prayer to hope that soon my feelings will drown me faster than the church's baptismal water." p. 63.

i.    Another poem in the "conflict development" portion of the story discusses the protagonist's thoughts about Communion. The protagonist titles the poem "All Over a Damn Wafer." p. 66.

j.    In that poem, the protagonist states: "I can feel the hot eyes of the Jesus statue watching me hide the wafer beneath the bench, where his holy body will now feed the mice." p. 66.

k.    All of the forgoing takes place, and the author has only reached page sixty-six of a 357-page book.

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

l.      Later, speaking of a boy she likes, the protagonist states that "in my dreams his is a mouth that knows more than curses and prayers.  More than bread and wine.  More than water.  More than blood.  More."  pp. 85-86.

m.      Any reasonably objective and informed reader would understand the author's use of Christian religious imagery and themes in the preceding passage and would understand that the protagonist is communicating to the reader that the promise of fleshly indulgence and individuality is "more" than the offers of Christianity – the bread, the wine, the water, and ultimately the blood.  Any reasonably objective and informed reader will understand that there's really no other way to read it, especially in light of the book's ultimate conclusion, which shall be addressed momentarily.

n.      In the meantime, at page 117, the author presents a poem stating: "[A]lthough I still want to stay seated during Communion, I get up every time, put the wafer in my mouth then slip it beneath the pew.  My hands shaking less and less every time I do."  p. 118.  She is growing more comfortable in her rejection of Christianity.

o.      In the very next passage the protagonist tells us that the Genesis story "all just seems like bullshit.  So I say so.  Out loud.  To Father Sean."  p. 119.  She is increasingly bold in expressing her rejection of Christianity.

p.      She titles the poem that follows "I think the Story of Genesis is Mad Stupid."  p. 120.  Among other things, the poem expresses the belief that everything in the Bible is simply a metaphor (a belief to which she returns in the book's concluding entry).

q.      Later in the story, after discovering poetry, the protagonist states: "Tuesday [the day the poetry club meets] has become my equivalent to Mami's Sunday.  A prayer circle."  p. 283.  Again, the religious terminology is conspicuous.

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

Case 3:20-cv-00596-GCM   Document 4-1   Filed 10/29/20   Page 9 of 24

r.      Mami is the maternal figure in the book whom any reasonably objective reader would understand represents the embrace of Christianity as a source of finding liberation and meaning in life.

s.      On information and belief, based on the structure and arc of the story, the juxtaposition between Christianity and individualism is intentionally presented in stark and explicit terms.

t.      In the book's crescendo, mother (Mami) and daughter (Xiamara – the Poet "X") finally have it out.

u.      The author describes the altercation in a poem titled "If Your Hand Causes You to Sin."  pp. 304-05.  Any reasonably objective reader would understand the title as a reference to Mami's belief that the individuality represented in the poetry of the protagonist separates her from God and thus constitutes sin.

v.      In giving the details of the actual physical altercation between the two, the author tells us that the mother "recites Scripture" while the daughter recites "memorized verses from her own poems and stanzas." p. 305.  Again, the juxtaposition between Christianity and individualism is on full, unapologetic display, as any reasonably objective and informed reader will understand.

w.      If there were any conceivable way to doubt that conclusion, the protagonist tells us on the very next page that one of the memorized verses the she recites from her poetry during the altercation declares that she raises her hands "to build the church of myself."  pp. 306-07.  So while the mother is "recit[ing] Scripture" to her, she's busy reciting back her own verses that build the church of herself.

x.      In the poems that follow and lead up to the book's conclusion, the protagonist expresses that "God just wants me to behave so I can earn being alive.  But what about me?  What

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

about Xiomara?" p. 333. She also tells us that her poems are about her own individuality: "All my poems are personal…. They're about me." p. 344. Again, it's God on the one hand and individuality on the other. God wants one thing of me, but what about what I want?

y.      Finally, the book concludes. In its concluding entry, the book uses Psalm 119:130 as a prologue: "The unfolding of your words gives me light; it gives understanding to the simple." p. 356. In the second sentence of that entry, the protagonist declares that "[t]he weird thing about the Bible is that almost everything in it is a metaphor." (So she's advanced a view on the proper way to interpretation Scripture, and one that is certainly highly controversial). And shortly thereafter she states, with respect to her conception of God, that "he or she is a comparison to us. I think we are all like or as God." And we're told by the School that this is not a primarily religious book?

z.      This final entry also expresses the belief that the Psalm in the prologue refers to "any of the words that bring us together" and that real liberation lies "in the power of my own words."

The main idea of the book – the big picture; the reference point by which all other components of the story must be understood – is diametrically opposed to the most fundamental Christian teaching. A reasonably objective and informed reader will understand that. Specifically, the lesson of the book, as expressly declared by the author in the book's conclusion, is that "we are all like or as God" and that we can finding meaning and liberation apart from the Christian understanding of God "in the power of [our] own words."

The reasonably objective and informed reader will know and understand that the book's fundamental conclusion tracks perfectly with the serpent's temptation of Eve. In the Garden of Eden in Genesis Chapter 3, the serpent comes to Eve and entices her to declare her independence

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

from God; rebel against Him, the serpent says, and find your own path, your own knowledge of good and evil, your own wisdom – and "your eyes will be opened, and *you will be like God*." Genesis 3:5 (emphasis added). So too does the main idea in the book teach that we are able to look to the "the power of [our] own words," to find our own liberation and that "*we are all like or as God*." That's *exactly* what the serpent said. A reasonably objective and informed reader will understand the parallel. In fact, to the reasonably objective and informed reader, it's impossible to miss.

And so it is, that having earlier called the "parable" of Eve "bullshit," the author returns to the Garden of Eden in the book's finale and declares the serpent the victor. We can find freedom and liberation in ourselves, independent of the Christian conception of God, in the power of our own words. Furthermore, we're no longer made in God's image (as Christian beliefs hold), He's made in ours. p. 356 ("I don't know what, who, or where God is. But if everything is a metaphor, I think he or she is a comparison to us. I think we are all like or as God."). And as independent god-deities, we can trust and rely on our "own words" to give us the "most freeing experience …." And we're told by the School that this isn't a primarily religious book?

The book's overarching main point is an overtly religious statement. It gives overtly religious treatment to an overtly religious topic and does so by express reference to Scripture, while proffering a highly controversial interpretation of all of it. It the book's main point (and there really are no sub-points, as all components of the book serve to help the author reach the main point at the end) is not a religious statement it's difficult to imagine one. Call it the "religion of individualism" or perhaps "the religion of secularism." *School District of Abington Township, Pennsylvania v. Schempp*, 374 U.S. 203, 225 (1963) ("It is insisted that unless these religious exercises are permitted a 'religion of secularism' is established in the schools. We agree of course

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

that the State may not establish a 'religion of secularism' in the sense of affirmatively opposing or showing hostility to religion, thus 'preferring those who believe in no religion over those who do believe.'"). Whatever we call it, it is plainly religious in the legal sense of the word. The Supreme Court has defined a "religious belief" for purposes of federal law as "[a] sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God" of traditionally religious persons. *United States ex rel. Lehman v. Laird*, 430 F.2d 96, 99 (4th Cir. 1970) (quoting *United States v. Seeger*, 380 U.S. 163, 176, 85 S.Ct. 850, 859, 13 L.Ed.2d 733 (1965)). Everything the author says and the conclusion the book reaches easily fits within that definition. Simply put, the *Poet X* is a religious book with religious messaging.

And the book's ultimate religious statement (which is the book's main and only point – that we can finding meaning and liberation independently of the Christian conception of God) is contrary in every way to the traditional Christian beliefs the protagonist consistently shuns, degrades, and disparages throughout the book. The reasonably objective and informed reader will understand this fact.

The book's contradiction of Christianity is no trivial matter. A reasonably objective and informed reader will understand that the Christian doctrine at issue is nothing less than the Christian's conception of temptation and original sin. The question of man's relationship to himself, to the world, and to his God. The book takes a position on that religious, theological question and does so explicitly at Christianity's expense. It is not presenting Christianity, or Human Secularism, or Individualism (or any other religion) in an objective, academic manner (as the School itself has expressly acknowledged, but more on that in a moment) – which the Supreme Court has said is the acceptable way for secondary schools to teach about religious views.

There really is no other reasonably objective or informed way to read the book. The author herself left us no interpretive wiggle room. The book's conclusion tells us explicitly what was already apparent enough – that the whole point of the book is the triumph of individualism over traditional Christian beliefs when it comes to matters of liberation, meaning, and fulfillment. The only way to present the book in any other manner is to completely ignore the express religious references, the explicit religious imagery, the intentional use of religious terminology, and the book's own explanation of its unmistakably religious main point.

All of the forgoing is enough to invalidate any government decision to use the book in any context. But the context here is not just any context. The School is a public secondary school – a context and environment the Supreme Court has described as compulsory and inherently coercive. In light of those characteristics, the Supreme Court has exercised "heightened vigilance" to protect against violations of the Religion Clauses. The public secondary school context thus suggests even more strongly that the School's decision to teach the *Poet X* should be invalidated and enjoined.

**The Heightened Scrutiny in Schools**

As the Supreme Court has made unmistakably clear, there is an added degree of sensitivity and scrutiny when the practice being challenged takes place in the public primary and secondary schools:

> The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools. Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary. The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure. Furthermore, "[t]he public school is at once the symbol of our democracy and the most pervasive means for promoting our

common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools.

*Edwards v. Aguillard*, 482 U.S. 578, 583-84 (1987) (citations omitted); *see also Zelman v. Simmons-Harris*, 536 U.S. 639, 719 (2002) (Breyer, J., dissenting) (collecting Supreme Court precedents suggesting that a key consideration in Establishment Clause cases is whether the challenged practice engenders 'those very divisive influences and inhibitions of freedom' that come with government efforts to impose religious influence on 'young impressionable [school] children')."

Thus, the context of the School's decision here – made with respect to the curriculum in a public secondary school – highlights and compounds the constitutional violation. In light of this context, the fact that the School offers students the ability to "opt out" of reading the book in favor of an independent study in no way ameliorates or rectifies the violation.

### Voluntary Opt Out Alternatives Don't Save Unconstitutional Activity

Because of the heightened constitutional concerns in the primary and secondary schools, the Supreme Court has routinely held that offering a voluntary alternative to the offending practice is not sufficient to salvage the unconstitutional policy. In fact, the Supreme Court has repeatedly faced and forcefully rejected the "voluntary alternative" argument. That argument, the Court has said:

> [G]ives insufficient recognition to the real conflict of conscience faced by the young student. The essence of the Government's position is that with regard to a civic, social occasion of this importance it is the objector, not the majority, who must take unilateral and private action to avoid compromising religious scruples, [by opting out of the offending exercise]. This turns conventional First Amendment analysis on its head. It is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice. To say that a student must remain apart from the [offending exercise] is to risk compelling conformity in an environment analogous to the classroom setting, where we have said the risk

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

of compulsion is especially high. Just as in *Engel v. Vitale*, 370 U.S., at 430, 82 S.Ct., at 1266, and *Abington School District v. Schempp*, 374 U.S., at 224-225, 83 S.Ct., at 1572-1573, we found that provisions within the challenged legislation permitting a student to be voluntarily excused from attendance or participation in the daily prayers did not shield those practices from invalidation, the fact that attendance at the graduation ceremonies is voluntary in a legal sense does not save the religious exercise.

*Lee v. Weisman*, 505 U.S. 577, 596 (1992).

Developing the point further, the Court observed that it was not "address[ing] whether that choice [to participate or opt out] is acceptable if the affected citizens are mature adults, but," the Court said, "we think the State may not, consistent with the Establishment Clause, place primary and secondary school children in this position. Research in psychology supports the common assumption that adolescents are often susceptible to pressure from their peers towards conformity, and that the influence is strongest in matters of social convention." *Id.* at 593.

### Permissible Religious Teachings – Objective and Academic Courses

Moreover, the Court has made clear the circumstances under which schools can teach about religion – as part of an objective, academic course of study. *Mellen v. Bunting*, 327 F.3d 355, 372 n.10 (4th Cir. 2003) ("If VMI's administration desires to teach cadets *about* religion, it is entitled to offer such classes in its curriculum. *See, e.g., Epperson v. Arkansas*, 393 U.S. 97, 106, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) ("[S]tudy of religions and of the Bible from a literary and historic viewpoint, *presented objectively* as part of a secular program of education, need not collide with the First Amendment's prohibition."); *Altman*, 245 F.3d at 76 ("[T]he Establishment Clause does not prohibit schools from teaching *about* religion.") (emphases added)).

Although it's apparent enough from the comprehensive review of the book above that the book makes no effort at an objective presentation of religion or religious beliefs, the School has actually admitted that it's not teaching the book for objective academic reasons. Plaintiffs were

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

able to obtain an email that they are informed and believe the School drafted and used to respond to inquiries after this controversy arose. According to the email, the School's choice of the *Poet X* isn't about academics. It's about a form of character education. Efforts to present to students "diverse thought and a range of opinions and perspectives to expand our awareness, stretch our thinking and ultimately help us grow as a school" in an effort to "prepare [students] for life after graduation."

As the email further explains, the point of the selections is to help the students grapple with, and ultimately answer, some of life's ultimate questions, such as questions about the students' "own identity in relation to the world." While the email states that "teachers guide the students with intelligent academic discussion" of each selection, the concluding paragraph makes plain that the primary objective of the selections, particularly as related to literature, is not an objective academic presentation of the intellectual tenets or practices of competing viewpoints.

Rather:

[P]reparing our students for success beyond high school goes well outside of strictly academic readiness and extends to introducing them to different thoughts and ideas, oftentimes through literature; books allow our students to access a world different from theirs and "meet" people, of varied backgrounds, races, ethnicities, experiences, social-economic circumstance and more. To send our graduates off into a world without this preparation can lead to the same ending as sending them off ill-equipped academically. What students can learn through literature and subsequent conversations with informed peers and teachers, is invaluable as they grow to be critical thinkers and well-rounded members of our society." (emphasis added).

The School's decision to teach the *Poet X* is not about academics or objective presentation of religious material. In the words of the email, the School's choice of literature and its perception of its mission "goes well beyond" strict academics. The choices are part of the School's attempt to provide a character education to students that will "prepare students for life after graduation"

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

by helping students discern their "identity in relation to the world" and enabling them to relate successfully to a diverse world beyond the walls of the schoolhouse.

This all sounds very familiar to those with sufficient familiarity with the Supreme Court's major Establishment Clause cases. The school board in *Abington School Dist. v. Schempp* gave identical reasons in support of its Bible reading and prayer policies: "*Abington School Dist. v. Schempp* held unconstitutional a statute 'requiring the selection and reading at the opening of the school day of verses from the Holy Bible and the recitation of the Lord's Prayer by the students in unison,' despite the proffer of such secular purposes as the 'promotion of moral values, the contradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature.'" *Edwards v. Aguillard*, 482 U.S. 578, 589-90 (1987).

So it's not an effort to educate children in the traditional sense of objective, academic, balanced presentation of materials. It's effectively about a form of social indoctrination – trying to teach children about tolerance and their identity in the world and so on and so forth. This shows that the School isn't teaching religious materials in the only acceptable manner (objective, academic study), and when it comes to the first prong of the *Lemon* test, which considers whether the challenged practice has a sufficiently secular purpose, raises serious questions about whether the decision to teach the book as part of a larger effort at character education can pass muster, and in fact Plaintiffs submit that the decision fails even this first prong. But either way, in light of the hostility and disparagement of Christianity, the decision to teach the book plainly cannot pass the second and third prongs of *Lemon* (the effects test and the excessive entanglement test). *Lambeth v. Board of Commr's of Davidson County, NC*, 407 F.3d 266, 269 (4th Cir. 2005) ("To pass muster under the Establishment Clause, a challenged government action must satisfy each of the Lemon test's three criteria"). Plaintiffs turn now to a consideration of the status of *Lemon*.

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

**_American Legion v. Am. Humanist Ass'n_, 139 S.Ct. 2067 (2019) and the _Lemon_ Test**

After the Supreme Court's most recent discussion of _Lemon v. Kurtzman_, 403 U. S. 602 (1971) in its _American Legion v. Am. Humanist Ass'n_, 139 S.Ct. 2067 (2019) opinion, the _Lemon_ test is on precarious footing. "If the _Lemon_ Court thought that its test would provide a framework for all future Establishment Clause decisions, its expectation has not been met. In many cases, this Court has either expressly declined to apply the test or has simply ignored it," Justice Alito wrote for the majority. _Id._ at 2080. After a long string cite cataloging the Court's Establishment Clause jurisprudence, Justice Alito announced that "[t]his pattern is a testament to the _Lemon_ test's shortcomings." _Id._ In light of the all the problems with _Lemon_, the Court expressly chose to scuttle the _Lemon_ test altogether in favor of a "presumption of constitutionality for longstanding monuments, symbols, and practices," _id._ at 2081, and it is not clear whether a current majority of the Supreme Court favors eliminating _Lemon_ entirely. Justice Breyer's concurring opinion in _American Legion_, joined by Justice Kagan, actually calls for an outright repudiation of _Lemon_: "I have long maintained that there is no single formula for resolving Establishment Clause challenges. … The Court must instead consider each case in light of the basic purposes that the Religion Clauses were meant to serve: assuring religious liberty and tolerance for all, avoiding religiously based social conflict, and maintaining that separation of church and state that allows each to flourish in its "separate spher[e]."... _American Legion_, 139 S.Ct. at 2090-91 (Breyer, J., concurring). So it is unclear whether and to what extent _Lemon_ remains good law.

What is clear, however, is that a government body's choice of teaching materials that are hostile to or disparaging of a particular religious view, especially when the hostility or disparagement is undertaken in advancing a competing religious view, simply cannot withstand First Amendment scrutiny – no matter what test is applied. The principles discussed, _supra_, are

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

the bedrocks of the Religion Clauses:  Government neutrality and the corollary requirements of

non-hostility  and  non-disparagement  are the touchstone of them all.  The *Poet X* fails those

principles.

It would also fail the *Lemon* test.  Although the purpose for teaching it is actually more

questionable than it would appear on its face (see the discussion above regarding the reasons

proffered in the School's post-controversy email), the evident hostility toward and disparagement

of Christian beliefs and practices would doom the book under the "effects" prong, as well as the

"excessive entanglement" prong.  *Mellen v. Bunting*, 327 F.3d 355, 374 (4th Cir. 2003) ("primary

effect"  "must  be  assessed  objectively,  in  order  to  measure  whether  the  principal  effect  of

government action 'is to suggest government preference for a particular religious view or for

religion in general."); *Am. Humanist Ass'n v. Maryland-National Capital Park*, 874 F.3d 195, 211

(4th Cir. 2017) ("excessive entanglement may lie simply where the government's entanglement

has the effect of advancing or inhibiting religion" and where, as here, the reading program entails

extensive oversight, monitoring, and execution by the school) (citing *Agostini v. Felton*, 521 U.S.

203, 232–33, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)).  The practice also violates the "excessive

entanglement" prong in its effort to promote diversity of religious views – another point that's

been decided by the Supreme Court.  *Town of Greece v. Galloway*, 527 U.S. 565, 586 (2014) ("The

quest  to  promote  "a  'diversity'  of  religious  views"  would  require  the  town  'to  make  wholly

inappropriate  judgments  about  the  number  of  religions  [it]  should  sponsor  and  the  relative

frequency  with  which  it  should  sponsor  each'"  which  was  a  "problematic"  "form  of  government

entanglement with religion").

And to the extent that Plaintiffs have also relied on the Free Exercise Clause, the evident

hostility and disparagement of Christianity in the book will also invalidate it in light of the Court's

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

recent *Masterpiece Cakeshop* opinion. Furthermore, with regard to Justice Breyer's Establishment Clause approach, the use of the *Poet X*, that choice does not promote "tolerance for all" – in fact, it's not exactly clear how the irony has escaped the School that it is trying to teach pluralistic tolerance by use of a book that spews disparaging invectives toward Catholic Christians as a matter of course. The book also does not help to "avoid[] religiously based social conflict" – in fact just the contrary; in light of the hostility toward and disparagement of Christian beliefs in the book, it has set the stage for religiously based social conflict. It engenders the very divisive forces that the Religion Clauses were meant to protect against. *Edwards v. Aguillard*, 482 U.S. 578, 583-84 (1987) ("In no activity of the State is it more vital to keep out divisive forces than in its schools."); *see also Zelman v. Simmons-Harris*, 536 U.S. 639, 719 (2002) (Breyer, J., dissenting) (collecting Supreme Court precedents suggesting that a key consideration in Establishment Clause cases is whether the challenged practice engenders 'those very divisive influences and inhibitions of freedom' that come with government efforts to impose religious influence on 'young impressionable [school] children')."

## Irreparable Harm

There can be no doubt that the Plaintiffs will suffer irreparable harm if forced to endure the School's unconstitutional choice of curriculum material. Courts routinely issue injunctive relief against infringements of First Amendment freedoms, as embodied by the DC Circuit's opinion in *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006) where the court explained that:

> Because, when an Establishment Clause violation is alleged, infringement occurs the moment the government action takes place — without any corresponding individual conduct — then to the extent that the government action violates the Establishment Clause, First Amendment interests are "threatened or in fact being impaired." Of course, this raises the question of the extent to which the disputed

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

government action actually violates the Establishment Clause — but this inquiry is addressed by another prong of the preliminary injunction calculation, the likelihood of the movant's success on the merits. Within the irreparable harm analysis itself — which assumes, without deciding, that the movant has demonstrated a likelihood that the non-movant's conduct violates the law — we examine only whether that violation, if true, inflicts irremediable injury. And because of the inchoate, one-way nature of Establishment Clause violations, which inflict an "erosion of religious liberties [that] cannot be deterred by awarding damages to the victims of such erosion," we are able to conclude that where a movant alleges a violation of the Establishment Clause, this is sufficient, without more, to satisfy the irreparable harm prong for purposes of the preliminary injunction determination.

## Balance of Equities

The balance of equities also counsels in favor of injunctive relief. As noted in the *Full Gospel Churches* opinion, this case involves an "inchoate, one-way" violation. Plaintiffs didn't ask to be put in this position. They made every effort to address it through proper channels at the school but did not get a positive response. Furthermore, Plaintiffs submit that the burden on the School if the Court were to issue injunctive relief would be minimal. On information and belief, the School would merely need to "reshuffle" its curriculum a bit and move the *Poet X* back in the reading list until such a time as the Court is able to resolve the merits of this dispute. Plaintiffs further note that they have already requested in their Complaint that this declaratory judgment action be expedited in accordance with Rule 57 and that Plaintiffs do not anticipate needing much time to get this matter ready to be presented. The legal research has been done, the subject book speaks for itself, and the School has already issued written statements about the reasons behind the School's decision to teach the book. Plaintiffs anticipate that the need for further discovery will be minimal, if any. Thus, this matter can be handled on an expedited basis with minimal burden or disruption to Defendants.

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

**Public Interest**

Plaintiffs submit that issuance of injunctive relief would be in the public interest for all of the forgoing reasons. It involves a substantial and serious claim of imminent violations of Plaintiffs' First Amendment rights. And Plaintiffs submit, also for the reasons developed more fully above, that they are likely to prevail on the merits and that any burden on Defendants would be minimal.

**CONCLUSION**

For the forgoing reasons, Plaintiffs respectfully request that the Court enter appropriate injunctive relief to maintain the status quo pending a ruling on the merits. Plaintiffs are likely to succeed on their First Amendment challenge, as the book chosen by the School plainly violates the neutrality, anti-hostility, and non-disparagement requirements the Supreme Court has said are the "touchstone" of the Religion Clauses. Furthermore, Plaintiffs will suffer irreparable harm if forced to endure implementation of Defendants' unconstitutional curriculum plans, the balance of equities weighs heavily in Plaintiffs' favor (as the burden on Defendants will be minimal), and the public interest weighs strongly in favor of protecting Plaintiffs' First Amendment rights until such time as the matter can be fully and finally resolved.

This the 29th day of October, 2020.

s/Joel M. Bondurant, Jr.
Joel M. Bondurant, Jr., #29621
Bondurant Litigation
15720 Brixham Hill Avenue
Suite 300
Charlotte, NC 28277
joel@bondurantlitigation.com

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction

## CERTIFICATE OF SERVICE

I hereby certify that on the date specified below, I electronically filed the forgoing MEMORANDUM IN SUPPORT OF MOTION FOR TRO/PRELIMINARY INJUNCTION with the Clerk of Court using the CM/ECF System, and that said Memorandum shall therefore be electronically served on Defendant/Plaintiff via NEF to his counsel through the Court's system at the email address counsel has registered in that system. Counsel's information is as follows:

James Middlebrooks
6715 Fairview Road Suite C
Charlotte, NC 28210
gil@middlebrooksesq.com
*Attorney for Defendants*.

This the 29th day of October, 2020.

s/Joel M. Bondurant, Jr._____
Joel M. Bondurant, Jr., #29621
Bondurant Litigation
15720 Brixham Hill Avenue
Suite 300
Charlotte, NC 28277
joel@bondurantlitigation.com

3:20-cv-00596
Memorandum in Support of TRO/Preliminary Injunction