| | |
|---|---|
| **JOHNNY H. COBLE JR. AND ROBIN COBLE,** both on behalf of their minor child "J.H.C.", <br><br> Plaintiff, <br><br> vs. <br><br> **LAKE NORMAN CHARTER SCHOOL, INC., et al.,** <br><br> Defendants. | TEMPORARY RESTRAINING ORDER |

**THIS MATTER** is before the Court on Plaintiffs' Motion for Temporary Restraining Order (Doc. No. 3), Amended Motion for Temporary Restraining Order, (Doc. No. 4), and Motion to Expedite Review of Plaintiffs' Motion for TRO/Preliminary Injunction (Doc. No. 5).

Plaintiffs filed their Complaint in this action against Defendants on October 27, 2020, seeking, inter alia, a temporary restraining order to prevent Defendants from including *The Poet X* in its ninth-grade language arts curriculum. Plaintiffs have alleged that by teaching this novel Defendants violate the Religion Clauses of the United States Constitution.

The Court has expedited consideration of this request given the time-sensitive nature of Plaintiffs' motion, the recent nature of the alleged violation, and the gravity of potential harm outlined in the pleadings.

Upon considering the arguments presented by both parties, this Court denies Plaintiffs' request for a TRO. Plaintiffs may proceed with this case after this denial. Today, the Court simply finds that Plaintiffs have not presented evidence sufficient to satisfy the four factors of

the Winter test to grant the "extraordinary remedy" of a preliminary injunction. Of those four factors, the Court especially emphasizes that Plaintiffs have not presented sufficient evidence that their claim is likely to succeed on the merits. The Court does not doubt the sincerity of Plaintiffs' religious objections, and the Court is troubled by Defendants' decision to teach a book that is so controversial that they have an established opt-out procedure in place to deal with "several students who have chosen not to read *The Poet X* this fall." (Doc. No. 9). Defendants should be mindful that public schools are entrusted with the children of diverse families from diverse religious backgrounds. As such, Defendants have a vital responsibility to ensure that their school is not a divisive environment. See Edwards v. Aguillard, 482 U.S. 578, 583–84 (1987). However, the Court does not intervene today to stop *The Poet X* from being taught because the law does not support such an action as will be explained below.

## I.  BACKGROUND

Defendants will begin teaching *The Poet X* by Elizabeth Acevedo on Monday, November 9, 2020. The book won the 2018 National Book Award for Young Adults. Spoken-word artist Acevedo's verse novel is an arresting portrait of a young poet coming into her own. In nearly every poem, the text grapples with at least one question about adolescence, family, gender, race, religion, or sexuality that will have readers thinking about these questions in their own lives.

The book tells the story of fifteen-year-old Xiomara, whose name means "one who is ready for war," as she grows up in a poor, urban neighborhood of Harlem. The self-described "brown and big and angry" Dominican girl furiously confronts catcalling boys, chafes under her Catholic parents' restrictive rules, endures verbal and physical abuse from her mother, and both adores and resents her "genius" twin brother, who seems to be everything she's not. She finds

moments of peace by writing in her poetry journal, joining a spoken-word poetry club, and exploring a blossoming romance with Aman, her science partner. The core tension in the book is between Xiomara and her mother. The book begins its ascent to a climax when devout Mami discovers that Xiomara and Aman were seen kissing on a train. Mami's fury at Xiomara's secret relationship is eclipsed only by the devastation that occurs when Mami finds and reads Xiomara's candid journal, which includes poems about her anger at her mother, boredom at church, and desire for Aman. Mami burns the journal of poems, and Xiomara flees home. The next day at school, her English teacher comforts her but stresses that she must return home and talk with her Mami. On her way to confront her mother, Xiomara seeks the help of the kind and understanding Catholic priest who has been teaching her confirmation class. The priest agrees to help her speak to her mother. In the final pages of the book, the priest mediates heartfelt discussions between Xiomara and her Mami and among the rest of her family. Her family, friends, the priest, and her English teacher all attend her first slam poetry competition and throw a party to celebrate her. At the end of the book, she doesn't know if she will ever be as religious as her Mami, but her "priest tells [her] it's OKAY to ask questions . . . even if they seem bizarre." She learns who she is and what she wants. And she knows that she wants to be a slam poet.

In the process of telling this story, the book contains several lines of poetry that seem to disparage religion, such as:

- *The Virgin Mary was "an impregnated virgin who was probably scared shitless."*
- *The "parable" of Eve is "bullshit." "[T]he Story of Genesis is Mad Stupid"*

- *Everything in the Bible is nothing more than "metaphor" "Jesus feels like … a friend I just don't think I need anymore."*

While these quotes disparage religion, Xiomara does not feel negatively toward religion as a whole and admires her best friend's faith, her brother's faith, and the kindness of the priest teaching her confirmation class. In fact, she appears to embrace faith again by the end of the novel, even if her faith is not the same as her Mami's.

Furthermore, in an email about why it decided to include *The Poet X* in the high school reading curriculum, Defendants wrote that the book will help students grapple with their "own identity in relation to the world" as "teachers guide the students with intelligent academic discussion" of the text. (Doc. No. 1-1). At the end of the email, the school explains why this book fits in with the purpose of a literature class:

> [P]reparing our students for success beyond high school goes well outside of strictly academic readiness and extends to introducing them to different thoughts and ideas, oftentimes through literature; books allow our students to access a world different from theirs and "meet" people, of varied backgrounds, races, ethnicities, experiences, social-economic circumstance and more. To send our graduates off into a world without this preparation can lead to the same ending as sending them off ill-equipped academically. What students can learn through literature and subsequent conversations with informed peers and teachers, is invaluable as they grow to be critical thinkers and well-rounded members of our society.

As this email makes clear, the school believes that teaching this book will create a space for critical discussion about diverse worldviews. The purpose is not to attack Catholicism.

Finally, Jennifer Hunt, an English Language Arts teacher at Norman Lake Charter School, submitted an affidavit in which she stated that in reading *The Poet X*, teachers "do not ask students to endorse or disapprove of Xiomara's religious views or any other person's view of religion." (Doc. No. 9). Instead, the novel is used to teach the following topics:

- Poesy (the art and mechanics of writing poetry)
- A representation of slam poetry (which is often very different from other forms of poetry)
- Characterization (dynamic, static, development)
- Themes of identity, family relationship, independence, finding one's voice, and stereotypes
- Literary devises and analysis
- Structure
- Verse v. Prose
- Writing
- Slam poetry and public speaking
  Poetry comparison (using the works of Maya Angelou and Jacqueline Woodson)

(Id.). Ms. Hunt also explained various assignments given to high schoolers about *The Poet X*, none of which involve religion. Id.

Plaintiffs argue that one of the primary goals of this book is to promote hostility toward religion, specifically Catholicism. As such, they believe that teaching "the book to . . . young impressionable minds" in a secondary school "runs afoul of the most basic precept underpinning the Religion Clauses—that government must remain neutral in matters of religion."

Notably, *The Poet X* was taught by Defendants during the 2018-19 school year, parents were notified in August 2020 that the book would again be part of the curriculum, and Plaintiffs confirmed on August 25, 2020 that they received notice that *The Poet X* would be taught in their son's ninth grade class. (Doc. No. 9). For students who would rather not read a main selection of an English Language Arts unit (or whose families object), Defendants allow them to opt out and to read another book. (Id.). Defendants offered this opt-out option to Plaintiffs' son when they raised objections to the book. (Id.). The school would have Plaintiffs' son read a different book with a different English Language Arts certified teacher in a different classroom. (Id.). In short, Defendants assure the Court that "he will have the same opportunities for meaningful engagement with the alternative text and with his classmates during that time." (Id.).

-5-

Case 3:20-cv-00596-GCM   Document 10   Filed 11/06/20   Page 5 of 17

## II.     TRO RULE

Applications for issuance of a TRO are governed by FED. R. CIV. P. 65(b). However, "when the opposing party actually receives notice of the application for a restraining order, the procedure that is followed does not differ functionally from that on an application for a preliminary injunction." Wright and Miller, 11A Fed. Prac. & Proc. Civ. § 2951 (3d ed.).

In evaluating a request for a TRO, the court considers the same factors applied for a preliminary injunction. Pettis v. Law Office of Hutchens, Senter, Kellam & Pettit, No. 3:13-CV-00147-FDW, 2014 WL 526105, at *1 (W.D.N.C. Feb. 7, 2014) (citing Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411 (4th Cir. 1999)). In assessing such factors, a plaintiff must demonstrate that: (1) it is likely to succeed on the merits; (2) it will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in its favor; and (4) the injunction is in the public interest. League of Women Voters of N. Carolina v. N. Carolina, 769 F.3d 224, 236 (4th Cir. 2014), cert. denied, 135 S. Ct. 1735 (2015) (citing Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)). Preliminary injunctions should not be granted when there is only a "possibility of irreparable harm" because a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter, 555 U.S. at 22 (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam) (emphasis added)).

## III.     ESTABLISHMENT CLAUSE

The Establishment Clause of the First Amendment requires government neutrality with respect to religion. Abington School District v. Schempp, 374 U.S. 203, 215 (1963). It was

-6-

Case 3:20-cv-00596-GCM   Document 10   Filed 11/06/20   Page 6 of 17

intended to protect against "sponsorship, financial support, and active involvement of the sovereign in religious activity." Lemon v. Kurtzman, 403 U.S. 602, 612 (1971).

To pass constitutional muster, challenged state action (1) must have a secular purpose, (2) must have a primary effect that neither advances nor inhibits religion, and (3) must not foster excessive state entanglement with religion. Lemon, 403 U.S. at 612–13. The option of nonparticipation does not save state action from an establishment clause challenge. Engel v. Vitale, 370 U.S. 421, 430 (1962). Finally, this Court notes that the Lemon test has been questioned but not overturned in recent Supreme Court cases. See, e.g., American Legion v. Am. Humanist Ass'n, 139 S. Ct. 2067, 2080 (2019).

Religious activities prohibited in public schools include daily readings from the Bible, Abington Sch. Dist., 374 U.S. at 203, recitation of the Lord's Prayer, (id.), posting the Ten Commandments in every classroom, Stone v. Graham, 449 U.S. 39 (1980), beginning school assemblies with prayer, Collins v. Chandler Unified Sch. Dist., 644 F.2d 759 (9th Cir. 1981), and teaching a Transcendental Meditation course that includes a ceremony involving offerings to a deity, Malnak v. Yogi, 592 F.2d 197 (3d Cir. 1979). The Supreme Court has stated clearly that literary or historic study of the Bible is not a prohibited religious activity. Stone, 449 U.S. at 42; Abington Sch. Dist., 374 U.S. at 225. Not all mention of religion is prohibited in public schools.

### IV. FREE EXERCISE CLAUSE

The free exercise clause recognizes the right of every person to choose among types of religious training and observance, free of state compulsion. Abington Sch. Distr., 374 U.S. at 222. To establish a violation of that clause, a litigant must show that challenged state action has a coercive effect that operates against the litigant's practice of his or her religion. Id. at 223.

-7-

One aspect of the religious freedom of parents is the right to control the religious upbringing and training of their minor children. See Wisconsin v. Yoder, 406 U.S. 205 (1972). As parents, Plaintiffs have a direct, personal right to direct their son's religious training. Collins v. Chandler Unified Sch. Dist., 644 F.2d at 764 n.1.

## V. RELIGIOUS HOSTILITY IN SCHOOLS

The Establishment Clause is often thought of as solely preventing the state from promoting or facilitating religion, but the case law has consistently clarified that the clause "is . . . violated as much by government disapproval of religion as it is by government approval of religion." Vernon v. City of L.A., 27 F.3d 1385, 1396 (9th Cir. 1994).

The classroom has long been fertile ground for Establishment Clause claims based on a hostility-to-religion theory. Schools have been a central battleground for good reason. Because public schools are "sites for the creation of American identity," the "[l]oss of control over what [is] taught in the schools would be evidence of lost control over the public meaning of American life." Jennifer L. Bryan, "Talking 'Religious, Superstitious Nonsense" in the Classroom: When do Teachers' Disparaging Comments about Religion Run Afoul of the Establishment Clause?, 86 S. CAL. L. REV. 1343, 1358 (citations omitted). The Supreme Court has made clear that there is an added degree of sensitivity and scrutiny when the practice being challenged takes place in public schools because "families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family." Edwards, 482 U.S. at 583–84 (citations omitted). Therefore, "in no activity of the State is it more vital to keep out divisive forces than in its schools." Id.

-8-

Case 3:20-cv-00596-GCM   Document 10   Filed 11/06/20   Page 8 of 17

Despite the impassioned insistence by many that schools have grown increasingly hostile to religion, charges of religious hostility have not fared well in the courts. Most of these claims have come in the form of complaints about the content of public-school curricula, assertions that the curricula either established religious hostility or the "religion" of secular humanism. Ultimately, however, religious parents and students have not had much success in their attempts to use the Establishment Clause or the Free Exercise Clause to force public schools to fashion curricula they consider ideologically or theologically palatable. Courts have been skeptical of these claims in part for a practical reason: devising a curriculum that would satisfy the demands of all faiths in a religiously pluralistic society would surely be an impossible task. And even more fundamentally, the case law has made clear that the First Amendment does not tolerate, much less mandate, curricula that "cast a pall of orthodoxy over the classroom." Epperson v. Arkansas, 393 U.S. 97, 105 (1968) (quoting Keyishian v. Bd. of Regents, 385 U.S. 589, 603 (1967)) (internal quotation marks omitted). The plaintiffs in these cases have therefore been unsuccessful because they have sought an unconstitutional remedy. It would violate the Establishment Clause "to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma." Epperson, 393 U.S. at 106. The cases have ended poorly for the plaintiffs no matter what element of the curriculum has been targeted, whether secular humanism in general, sex education, evolution, or gay tolerance.

Therefore, in employing the three-pronged Lemon test to determine whether Plaintiffs will likely succeed on their religion clause claims against Defendants, the Court is mindful of the particular concerns that arise in the context of public secondary schools but also that religious challenges to school curricula, especially challenges to a particular book in a single course, have

proven unsuccessful. See, e.g., Grove v. Mead Sch. Dist. No. 354, 753 F.2d 1528 (9th Cir. 1985) (holding that teaching *The Learning Tree*, a book that frequently disparaged Christianity, did not violate the Establishment Clause or Free Exercise Clause).

## VI.  DISCUSSION

The Court has closely read the Complaint (Doc. No. 1), the documents attached thereto, and the arguments stated in the instant motion. The Court finds that Plaintiffs have, at least initially, failed to make the required showing for a TRO.

As to the first consideration, the Court does not find enough evidence to support Plaintiffs' contention that Defendants likely violated either the Establishment Clause or Free Exercise Clause. In considering whether to grant a TRO, it is the burden of the plaintiff to present the court with a forecast of evidence demonstrating likelihood of success. Here, Plaintiffs did not put forward evidence that the school was endorsing the religious views contained in *The Poet X* or that their son would be harmed by the school including the book in the ninth grade English Language Arts curriculum.

The sincerity of Plaintiffs' religious objections to *The Poet X* is not disputed, nor is the fact that the book deeply offends Plaintiffs. Even accepting, however, that the work is antithetical to the particular Christian beliefs espoused by Plaintiffs, its inclusion in the high school curriculum alone does not violate the Establishment Clause. "[O]ne of the mandates of the First Amendment is to promote a viable, pluralistic society and to keep government neutral, not only between sects, but between believers and nonbelievers." Walz v. Tax Comm'n, 397 U.S. 664, 716 (1970) (Douglas, J., dissenting).

Under Lemon, a state action or enactment does not violate the establishment clause if (1) it has a secular purpose; (2) its principal or primary effect is neither to advance nor inhibit religion; and (3) it does not foster excessive governmental entanglement with religion. Id. at 612–13. Although clarity, in the current context, would be aided by substituting "non-religious" for "alternative belief," none of these factors supports a finding of likely impermissible establishment in this case.

Plaintiffs largely rest their claim on Part 2 of the Lemon test by arguing that teaching *The Poet X* has a primary effect of advancing alternative beliefs and inhibiting religion, but they also allege violations of the other two prongs.

Here, Defendants state that the book was included within the curriculum for two entirely non-religious (i.e., secular) and commendable purposes: (1) exposing students to different cultural outlooks and (2) teaching literary form and mechanics. In marked contrast to the orchestrated prayer, mandatory Bible reading, Decalogue, or creationism cases all of which involved the school's promoting religion, Plaintiffs have not presented adequate evidence that *The Poet X* was selected by the school out of hostility toward Christianity or fealty to any secularist credo. "The purpose prong of the Lemon test asks whether government's actual purpose is to endorse or disapprove of religion." Lynch v. Donnelly, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring). No such purpose has been adequately shown.

The crux of Plaintiffs' Establishment Clause claim is therefore that inclusion of *The Poet X* in the public school curriculum has the primary effect of advancing the "religion" of "alternative beliefs," while being hostile toward Christianity, especially Catholicism. (Doc. No. 4 at 2). Plaintiffs insist that the book launches a "frontal assault on Christian beliefs and values."

(Id.). Assuming, arguendo, that this characterization is correct, and that such views are consistent with "with an alternative path to liberation and meaning," (Id.) "'not every law that confers an "indirect," "remote," or "incidental" benefit upon [religion] is, for that reason alone, constitutionally invalid.' " Lynch, 465 U.S. at 683 (quoting Committee for Pub. Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 771 (1973)). "Total separation of church and state is simply impossible." Grove, 753 F.2d at 1539 (Canby, J. concurring)(citing Lynch, 465 U.S. at 678-79). In other words, the First Amendment is not violated merely because particular governmental activity "'happens to coincide or harmonize with the tenets of some or all religions.'" Harris v. McRae, 448 U.S. 297, 319 (1980).

The issue is not whether *The Poet X* embodies anti-Christian elements; the Court assumes that it does. Instead, the issue is whether its selection and retention by school officials "communicat[es] a message of government endorsement" of those elements. It is not the purpose of the public schools "to cultivate an official faith or ideology, whether religious or humanistic in character...." Kauper, "Prayer, Public Schools and the Supreme Court," 61 MICH. L. REV. 1031, 1066 (1963). Yet, even the Bible may occupy a place in the classroom, provided education and exposure do not become advocacy or endorsement. Abington, 374 U.S. at 225.

In assessing whether inclusion of *The Poet X* communicates governmental endorsement or approval of its purportedly "anti-Christian" elements, the Court must first examine the work as a whole. See Lynch, 465 U.S. at 679. The passages identified by Plaintiffs are references to religion in a work depicting a poor, Afro-Latina, adolescent's painful process of coming of age. These passages are less theology than anthropology, less commentary on religion than comment prompted by the frustrating confrontation of adolescents with parents, sexual desire, religious

-12-

doubt, and loneliness. And while that distinction might be lost on third-graders, it is bound to be understood by Plaintiffs' son's classmates—high school freshman confronting many of the same questions, and doubtless beginning to appreciate many of the challenges of making decisions about who they want to be.

Second, the Court must examine the work as a whole in the context of the entire curriculum. Even though the Court is not aware of all the books in Defendant's freshman literature curriculum, surely this is not the only book to be read. Were the school board in Plaintiffs' district to require local principals to read over their public address systems a resolution, drawn in words from the book, declaring Jesus Christ to be a "friend who texts too much," or "a friend we don't think we need anymore," there would be little doubt that the effect would be to communicate governmental endorsement of anti-Christian sentiments. Here, however, *The Poet X* bears the sole signature of its author, Elizabeth Acevedo. It is a work of fiction, not dogmatic philosophy. It is one book, only tangentially "religious," thematically grouped with others in the freshman literature curriculum. And based on the evidence before the Court at this early stage, the purpose and effect appears to be to expose students to the attitudes and outlooks of an important American subculture.

Plaintiffs may be correct in suggesting that the work "hard[ly] ... constitutes the objective study of Christianity", yet objectivity in education need not inhere in each individual item studied; if that were the requirement, precious little would be left to read. Instead, objectivity is to be assessed with reference to the manner in which often highly partisan, subjective material is presented, handled, and "integrated into the school curriculum, where [even] the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative

-13-

religion, or the like." Stone, 449 U.S. at 42; see Abington Sch. Dist., 374 U.S. at 225. At this time, Plaintiffs have not presented evidence about how the book is taught to prove the school is being hostile to religion.

Similarly, inclusion of *The Poet X* as representative of a particular literary genre (slam poetry / verse novel) neither religiously inhibits nor instills, but simply informs and educates, students on a particular social outlook forged in the crucible of Afro-Latinx urban life. To include the work in the curriculum, without further evidence of the school's endorsement, no more communicates governmental endorsement of the author's or characters' religious views than to assign *Paradise Lost*, *Pilgrim's Progress*, or *The Divine Comedy* conveys endorsement or approval of Milton's, Bunyan's, or Dante's Christianity.

It remains to be considered whether the work "inhibits" Catholicism, as Plaintiffs contend. There is, at least initially, apparent merit to this claim. When the work does discuss religion, it often does so in a fashion that generally casts doubt upon Catholic doctrine—from the inerrancy of Scripture to the role of women in society. Nevertheless, in the context presented, these passages do not offend the Establishment Clause.

First, the work's purported hostility to religion may be more apparent than real. It is true that questioning traditional religion is one of the topics of the work. Yet the same might be said of celebrated authors such as Chaucer, Voltaire, Paine, Twain, or Sinclair Lewis. It is also true that the adolescent protagonist in the *The Poet X* comes to doubt and question many of the simple pieties she has been taught. In the novel, her mother quotes scripture to her while abusing her, and she feels unloved and alone in the church. These circumstances lead to searching questions and nagging doubts. But they are not new questions; even figures in the Bible like Job

-14-

doubted God's goodness. Neither do Xiomara's questions reflect hostility toward religion. In fact, by the end of the novel, the protagonist has developed a better relationship to faith, and the Catholic priest is critical to repairing the hurt that has defined her family for much of the novel.

Of course, Plaintiffs may personally support the traditional religious doctrines doubted by the protagonist in *The Poet X*. The issue, however, is not whether the work disapproves of any particular religious vision, including Plaintiffs', but whether its inclusion in the public school curriculum indicates, intentionally or not, that the government joins in that disapproval. Because there has been an insufficient showing that Defendants endorse these views, it is not likely that Plaintiffs will succeed on the merits.

As to the second consideration, the Court finds that Plaintiffs are not likely to suffer irreparable harm absent an injunction because the school has provided accommodations to Plaintiffs' son that enable him to opt out of reading the book while still receiving the same quality of instruction from a different English Language Arts certified teacher. In their brief, Plaintiffs contend that allowing students to opt out of an activity is not sufficient to salvage an unconstitutional policy. In doing so, they cite several Supreme Court cases where the Court held that voluntary opt-out policies in schools did not remedy policies that violate the Establishment Clause. But in each of the cited cases, the Court first made a finding that an Establishment Clause violation had occurred. Here, no such finding has been made. For example, in Engel and Abington School District, school districts mandated daily prayer, and the schools allowed students to leave class during daily prayers if they objected to participation. 370 U.S. at 430; 374 U.S. at 224-25. In those cases, the Court found that the school had established a religion by having the whole school participate in religious prayers. Therefore, giving the students the

-15-

chance to leave made them feel like outsiders of a government, established religious community. Here, Defendants included a book hostile to certain forms of Christianity in a literature curriculum, and Plaintiffs have not provided sufficient evidence that Defendants endorse the beliefs in the book in any way similar to the schools' endorsement of religious prayer in Engel and Abington School District. Furthermore, it has long been established that providing students the ability to opt out of reading objectionable texts mitigates any potential Free Exercise violation. See, e.g., Grove, 753 F.2d at 1533 (reasoning that allowing a student to opt out of reading *The Learning Tree* mitigated against a finding of a Free Exercise violation).

As to the third factor, the balance of hardships weighs against issuing the TRO. While this Court is sensitive to Plaintiffs' desire to push *The Poet X* to later in the curriculum to give this Court more time to hear a more developed case, the fact remains that granting the TRO would require the school district to rearrange a carefully crafted curriculum. Furthermore, Plaintiffs have been aware that this book was in the curriculum for months and waited until only last week to file a complaint thereby leaving the school with little time to reformulate the English Language Arts curriculum.

Fourthly, the Court has considered where the public interest lies. The public has an interest in parents being able to control the religious upbringing of their children, but it also has an interest in public schools being able to teach students using a thoughtfully established curriculum. The Court can find no indicia at this point that teaching *The Poet X* will be burdensome to Plaintiffs' religious rights. This factor weighs against issuance of a TRO.

### VII.   CONCLUSION

In short, the four factors of the <u>Winter</u> test taken together weigh significantly against issuing a TRO. The Court therefore concludes that a Temporary Restraining Order is an inappropriate remedy as the Plaintiffs' have not met their burden under the <u>Winter</u> test.

## ORDER

**IT IS, THEREFORE, ORDERED** that Plaintiffs' Motion for a Temporary Restraining Order (Doc. Nos. 3, 4) is **DENIED**. Plaintiffs' Motion to Expedite Review of Plaintiffs' Motion for TRO/Preliminary Injunction, (Doc. No. 5), is **GRANTED**.

Signed: November 6, 2020

Max O. Cogburn Jr
United States District Judge