UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20-CV-00596

| | |
|---|---|
| JOHNNY H. COBLE, JR. and ROBIN COBLE, both on behalf of their minor child "J.H.C.", <br><br> Plaintiff, <br><br> vs. <br><br> LAKE NORMAN CHARTER SCHOOL, INC., et al., <br><br> Defendant. | **ORDER** |

**THIS MATTER** is before the Court on Defendant's Motion to Dismiss Plaintiff's Complaint. (Doc. No. 17). For the reasons set forth below, Defendant's motion is granted.

## I. PROCEDURAL HISTORY

On October 27, 2020, Plaintiffs ("the Cobles") filed their Complaint seeking declaratory judgment under "the Religion Clauses of the First Amendment to the United States Constitution." (Doc. No. 1 at ¶ 45). Subsequently, they filed a Motion for Temporary Restraining Order (Doc. No. 3); Amended Motion for Temporary Restraining Order (Doc. No. 4); and Motion to Expedite Review of Plaintiffs' Motion for TRO/Preliminary Injunction (Doc. No. 5) on October 29, 2020. This Court heard oral argument on the Cobles' TRO motion on November 4.

On November 6, 2020, this Court denied the request for a temporary restraining order. (Doc. No. 10). The Cobles filed an interlocutory appeal to the Fourth Circuit on November 9. (Doc. No. 11). The Fourth Circuit dismissed the appeal in its entirety on November 19. (Doc.

1

No. 16). The Cobles also informed this Court that they had "decided to forgo any further effort to obtain preliminary injunctive relief." (Doc. No. 15).

## II. BACKGROUND

This case involves the use of a book titled *The Poet X* by Elizabeth Acevedo in Lake Norman Charter School's ("LNC") high school literature curriculum. The book won the 2018 National Book Award for Young Adults. The text grapples with questions about adolescence, family, gender, race, religion, and sexuality and pushes readers to think about these issues in their own lives.

In the process of telling this story, the book contains several lines of poetry that disparage religion, such as:

- The Virgin Mary was "an impregnated virgin who was probably scared shitless."
- The "parable" of Eve is "bullshit." "[T]he Story of Genesis is Mad Stupid"
- Everything in the Bible is nothing more than "metaphor" "Jesus feels like … a friend I just don't think I need anymore."

In addition to these disparaging quotes, the book also contains several positive references to religious belief.

The Cobles claim that teaching this book in the high school curriculum violates the First Amendment religious rights of their minor son J.H.C. because the text itself "pervasively and explicitly disparages Catholicism and Christianity." (Doc. No. 21 at 1). However, the Cobles make no allegations as to the specifics of LNC's use of *The Poet X* in the classroom. They also do not allege specific allegations about how the school's decision to teach the book inhibited their son's religious rights. In short, Plaintiffs' claims boil down to the argument that because this book is hostile to religion and disparages Catholicism it violates the Establishment Clause and the Free Exercise Clause of the First Amendment.

Defendants contend that Plaintiff's argument should be dismissed for two reasons. First, they argue that the case is moot since The Poet X language arts unit has now concluded. Therefore, there is no chance that the Cobles' son will have to read the book at LNC in future language arts classes. Second, they argue that the case should be dismissed for failure to state a claim because the Complaint contains nothing regarding (a) how LNC planned to use the book; (b) JHC's personal beliefs; or (c) how LNC's specific use of the book would unduly burden his religious practices. In short, they contend that the allegations in the Complaint are conclusory and therefore do not state a First Amendment claim under either the Establishment Clause or Free Exercise Clause.

## II. STANDARDS OF REVIEW

Mootness and Lack of Subject-Matter Jurisdiction

Once a motion to dismiss based on lack of subject matter jurisdiction has been filed under Fed. R. Civ. P. 12(b)(1), the plaintiff bears the burden to prove that subject matter jurisdiction does exist. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). Where the case has been mooted by subsequent developments, the court no longer has jurisdiction and must dismiss. Flast v. Cohen, 392 U.S. 83, 95 (1968).

When considering a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, "the court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." Richmond, Fredericksburg & Potomac R.R. v. United States, 945 F.2d 765, 768 (4th Cir. 1991) (citing Adams, 697 F.2d at 1219). See also Kerns v. United States, 585 F.3d 187, 192 (4th Cir.

3

2009) (permissible to go beyond the pleadings in motions to dismiss for lack of subject matter jurisdiction).

"Mootness principles derive from the requirement in Article III of the Constitution that federal courts may adjudicate only disputes involving a case or controversy." Williams v. Ozmint, 716 F.3d 801, 808 (4th Cir. 2013) (internal quotation marks omitted). "The case-or-controversy requirement applies to all stages of a federal case." Id. Thus, "[i]f a live case or controversy ceases to exist after a suit has been filed, the case will be deemed moot and dismissed for lack of standing." Pender v. Bank of Am. Corp., 788 F.3d 354, 368 (4th Cir. 2015). "A case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." Williams, 716 F.3d at 809 (internal quotation marks omitted).

There is, however, a well-established mootness exception for conduct "capable of repetition, yet evading review." Lux v. Judd, 651 F.3d 396, 401 (4th Cir. 2011) (citations omitted). This exception applies when "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." Fed. Election Comm'n v. Wisc. Right to Life, Inc., 551 U.S. 449, 462 (2007).

Moreover, the United States Supreme Court recently held that nominal damages are sufficient to satisfy the redressability prong of standing. See Uzueghunam et al. v. Preczewski, U.S. No. 19-968, (Decided March 8, 2021). In other words, the Court held that even if all harms other than nominal harm from a completed constitutional violation exists, then the case will not become moot for failure to satisfy the redressability prong of standing. See id.

4

Failure to State a Claim under Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. See In re Birmingham, 846 F.3d 88, 92 (4th Cir.), as amended (Jan. 20, 2017). To survive such a motion, a complaint must contain sufficient factual allegations "to raise a right to relief above the speculative level, thereby nudging its claims across the line from conceivable to plausible." Vitol, S.A. v. Primerose Shipping Co., 708 F.3d 527, 543 (4th Cir. 2013) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

When ruling on a motion to dismiss, the Court considers "the complaint in its entirety, as well as documents attached or incorporated into the complaint." E.I. du Pont de Nemours, 637 F.3d at 448 (citation omitted). The Court "must accept as true all of the factual allegations contained in the complaint" and draw "all reasonable inferences" in favor of the non-movant. Id. Even so, factual allegations are insufficient if they rely on "naked assertions" and "unadorned conclusory allegations" that are "devoid of factual enhancement." In re Birmingham, 846 F.3d at 92. The Court "is not obliged to assume the veracity of the legal conclusions drawn from the facts alleged." Id.

In Iqbal, the Supreme Court made clear that "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." 556 U.S. at 679.

III. **DISCUSSION**

   a. **Mootness**

5

This case falls into the exception for conduct "capable of repetition, yet evading review." The Cobles allege that LNC violates the Establishment Clause and the Free Exercise Clause by teaching The Poet X in a public high school. LNC has taught The Poet X in previous years, and the book could be included in LNC's language arts curriculum in future years. Teaching The Poet X requires only a few weeks; therefore, it would be nearly impossible for a case to work its way through the judicial system before instruction regarding the book is completed. In other words, the issues in this case may arise again and will often or always face timing challenges.

Secondly, the case is not moot due to a lack of redressability. The Cobles claim that the violation of their son's religious rights should be remedied, at a minimum, by nominal damages. Under Uzueghunam, nominal damages is all that is required to satisfy redressability. See supra.

Therefore, this Court denies LNC's request for dismissal based on mootness under Rule 12(b)(1).

    **b. Failure to State a Claim**

        **i. The Establishment Clause Claim**

The First Amendment states in pertinent part that "Congress shall make no law respecting the establishment of religion or prohibiting the free exercise thereof." U.S. CONST. AMEND. I, cl. 1. "The Establishment Clause limits any governmental effort to promote particular religious views to the detriment of those who hold other religious beliefs or no religious beliefs, while the Free Exercise Clause affirmatively requires the government not to interfere with the religious practices of its citizens." Brown v. Gilmore, 258 F.3d 265, 274 (4th Cir. 2001).

To state a claim, the Cobles' Complaint must allege facts that, if true, would satisfy at least one of the three prongs of the Lemon test: (i) that there is no secular purpose for the

governmental action; (ii) the principal or primary effect advances or inhibits religion; and (iii) that the action "must not foster an excessive government entanglement with religion." Lemon v. Kurtzman, 403 U.S. 602, 612–613 (internal citations omitted). The Complaint does not allege any such facts.

The Cobles make conclusory allegations that LNC violates the Lemon test merely by the decision to teach a book that they perceive as hostile to Christianity and supportive of a non-Christian worldview. (See Doc. No. 1 at ¶¶ 46-53). In the words of the Cobles in their response brief, "Plaintiffs are challenging [the Poet X] first and foremost because it disparages Christianity and it does so explicitly and pervasively." (Doc. No. 21 at 5). To the Cobles, the case begins and ends with LNC's decision to teach a book with the anti-Christian content of The Poet X.

But the Lemon test demands more. It is not the content of the book or LNC's decision to teach the book that is the relevant legal issue. Rather, what matters is how LNC uses the book in the classroom. As the Supreme Court has made clear, even the Bible can be taught for particular purposes in public school without running afoul of the Establishment Clause. Stone v. Graham, 449 U.S. 39, 42 (1980).

"The first prong of the Lemon test asks whether the government's conduct has an adequate secular object. This directive requires an inquiry into the subjective intentions of the government . . . [and requires] the government to show that it had a plausible secular purpose for its action. Notably, the government's purpose need not be exclusively secular." Wood v. Arnold, 915 F.3d 308, 313–314 (4th Cir.), cert. denied, 140 S. Ct. 399 (2019). Furthermore, the court is deferential to the state's intent and purpose, as long as it "is genuine, not a sham, and not merely

7

Case 3:20-cv-00596-MOC-DSC   Document 31   Filed 03/23/21   Page 7 of 15

secondary to a religious objective." McCreary v. ACLU of Ky., 545 U.S. 844, 864 (2005). A consideration of the context and curriculum is essential in evaluating whether there is a secular purpose. Wood, 915 F.3d at 316.

The Cobles' Complaint fails to include allegations regarding either the context or curriculum, but it does include an attachment of a communication from LNC that shows that the school had a secular purpose for teaching the book. In an explanation to parents about why the school would be teaching The Poet X, LNC wrote that LNC's:

> focus is to best serve our students and prepare them for life after graduation. This view is also why we seek experiences for our students to help develop their awareness of the experience and lives of others who perhaps hail from a different part of the globe, possess different backgrounds or skin tones or hold ideologies unfamiliar to them . . . We strongly believe that preparing our students for success beyond high school goes well outside of strictly academic readiness and extends to introducing them to different thoughts and ideas, oftentimes through literature; books allow our students to access a world different than theirs and "meet" people, of varied backgrounds, races, ethnicities, experiences, social-economic circumstance and more. To send our graduates off into a world without this preparation can lead to the same ending as sending them off ill-equipped academically. What students can learn through literature and subsequent conversations with informed peers and teachers, is invaluable as they grow to be critical thinkers and well-rounded members of our society.

(Doc. No. 1-1). Including this email in their Complaint works against the Cobles' argument because it demonstrates that the book was taught for a clearly secular purpose: character education.

Character education is a primary purpose and recognized duty of public education. In fact, the State of North Carolina has codified it as an educational requirement for its public schools. See N.C. GEN STAT. § 115C-81.60. Furthermore, the Supreme Court has recognized:

> The role and purpose of the American public school system were well described by two historians, who stated: "public education must prepare pupils for citizenship in the Republic. * * * It must inculcate the habits and manners of

8

> civility as values in themselves conducive to happiness and as indispensable to the practice of self- government in the community and the nation". In Ambach v. Norwick, we echoed the essence of this statement of the objectives of public education as the "inculcation of fundamental values necessary to the maintenance of a democratic political system." These fundamental values of "habits and manners of civility" essential to a democratic society must, of course, include tolerance of divergent political and religious views, even when the views expressed may be unpopular.

Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 681 (1986) (internal citations and quotations omitted). Appellate courts throughout the country have also reasoned that ""a governmental attempt to instill in . . . public school children such values as independent thought, tolerance of diverse views, self-respect, maturity, self-reliance and logical decision-making . . . is an entirely appropriate secular effect." Smith v. Bd. of Sch. Comm'rs of Mobile Cty., 827 F.2d 684, 692 (11th Cir. 1987).

The Cobles' conclusory allegation that "the School's purpose is not secular at all" cannot survive a motion to dismiss because the Complaint omits any factual allegation to support that assertion. (Doc. No. 1 at ¶ 51). The Cobles clearly believe that The Poet X disparages their faith but ignore the requirement that legal conclusions must flow from factual allegations contained in the Complaint. Without the latter, the Complaint fails to state a claim that LNC's specific use of the book violates the first part of Lemon's test.

The second prong of the Lemon test requires that the principal or primary effect of the government action neither advance nor inhibit religion. Lemon, 403 U.S. at 612–613. Put slightly differently, Lemon's second prong looks to whether, in its specific use of The Poet X, LNC communicates an official endorsement or disparagement of a religious message. Religious topics are not taboo, however. "Public schools are not obliged to shield individual students from ideas which potentially are religiously offensive, particularly when the school imposes no requirement

9

that the student agree with or affirm those ideas." Parker v. Hurley, 514 F.3d 87, 106 (1st Cir. 2008).

In the Fourth Circuit, "the primary effect prong asks whether, irrespective of government's actual purpose, a reasonable, informed observer would understand that the practice under review in fact conveys a message of endorsement or disapproval of a religion." Wood, 915 F.3d at 316 (internal citations omitted). Courts "presume that a reasonable observer in the endorsement inquiry is aware of the history and context of the . . . forum in which the religious speech takes place." Id.

The problem with the Cobles' claim is that, without any factual allegations of how LNC uses The Poet X in the classroom, the Court has no ability to determine whether that specific use conveys an endorsement or disapproval of religion. The content of the book itself is not sufficient to prove a violation of the second Lemon prong even if the book's content is disparaging toward a particular faith.

Other circuits dealing with curricular challenges based on the Establishment Clause uniformly focus on the specific use to which allegedly objectional material is put. For example, in Grove v. Mead School Dist. No. 354, the mother of a high school student sued the school district after it refused to remove The Learning Tree from its English literature curriculum. 753 F.2d 1528, 1531 (9th 1985). The Learning Tree was described by the trial court as "a novel with autobiographic overtones used in the English literature class for purposes of exposing students to expectations and orientations of Black Americans." Id. at 1534. The Ninth Circuit noted that "central theme of the novel is life, especially racism, from the perspective of a teenage boy in a working class black family." Id. Relying on (i) the secular nature of the book and (ii) that the

book "was included in a group of religiously neutral books in a review of English literature, as a comment on American subculture," the court concluded that its use does not constitute establishment of religion or anti-religion. Id.

In Brown v. Woodland Joint Unified School District, 27 F.3d 1373 (9th Cir. 1994), and Fleischfresser v. Directors of Sch. Dist. 200, 15 F.3d 680 (7th Cir. 1994), parents claimed that the use of Impressions, a primary school reading series that promoted reading through literary selections and "suggested learning activities, such as having children compose rhymes and chants, act out the selections, and discuss the selections' characters and themes," constituted witchcraft and, therefore, an endorsement of religion. Brown, 27 F.3d at 1376. In both Brown and Fleischfresser, the Courts of Appeal concluded that, as used, the Impressions series did not violate the second prong of the Lemon test. The courts considered the specific manner in which the materials were employed in the classroom and concluded that "the primary or principal effect of the use of the reading series at issue is not to endorse these religions, but simply to educate the children by improving their reading skills and to develop imagination and creativity." Fleischfresser, 15 F.3d at 689.

Recently, the Ninth Circuit came to the same conclusion: that what counts is the manner in which the challenged materials are taught. California Parents for the Equalization of Educ. Materials v. Torlakson, 973 F.3d 1010, 1021 (9th Cir. 2020). Just alleging that a book or other text is religiously offensive is not enough to make out a claim under the Establishment Clause.

In Wood, Grove, Brown, Fleischfresser, and Torlakson, the circuit courts focused on the specific manner in which the challenged materials were taught in reaching their conclusions that the use of those materials neither endorsed nor disparaged a religious position. Because they

11

made no factual allegations as to how LNC planned to use the book, the Cobles have failed to make out a claim that LNC's use of the book to teach literary themes in a high school language arts course endorses or disparages a particular religion.

Finally, the Cobles' Complaint also fails to allege a violation of Lemon's third prong, which forbids "excessive government entanglement with religion." Lemon, 403 U.S. at 612–613 (internal citations omitted). Excessive government entanglement generally concerns "the government's invasive monitoring of certain activities in order to prevent religious speech, or the funding of religious schools or instruction." Wood, 915 F.3d at 318. It may also be shown when government advances or inhibits religion. Id.

Again, the mere choice of a book is insufficient to survive. Because they chose not to make factual allegations of how LNC uses The Poet X in the classroom, the Cobles fail to state a claim that LNC is engaging in an excessive entanglement with a particular religion through behavior that monitors, prevents, or promotes a particular religion. See Wood, 915 F.3d at 318.

In short, the Cobles have failed to allege sufficient facts to make out a constitutional claim under the Establishment Clause of the First Amendment.

      ii.   The Free Exercise Clause Claim

The First Amendment's prohibition on laws "respecting an establishment of religion, or prohibiting the free exercise thereof" applies to the states through the Fourteenth Amendment. Cantwell v. Conn., 310 U.S. 296, 303 (1940). In Smith, the Supreme Court noted that the "free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." 494 U.S. 872, 877 (1990). As a result, the government may not, for example, (1) compel affirmation of religious beliefs; (2) punish the expression of religious

doctrines it believes to be false; (3) impose special disabilities on the basis of religious views or religious status; or (4) lend its power to one side or the other in controversies over religious authorities or dogma. Id. at 16. "The Free Exercise Clause, importantly, is not a general protection of religion or religious belief." Parker v. Hurley, 514 F.3d 87, 103 (1st Cir. 2008). "It has a more limited reach of protecting the free exercise of religion." Id. Even if the challenged government action would interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own beliefs, such interference is not itself alone to violate the Free Exercise Clause. See Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439 (1988); Parker, 514 F.3d at 103.

In Mozert v. Hawkins County Board of Education, 827 F.2d 1058 (6th Cir.1987), which is factually similar to this case, the Sixth Circuit rejected a claim for an exemption from a school district's use of an entire series of texts. The parents in that case asserted that the books in question taught values contrary to their religious beliefs and that, as a result, the school violated the parents' religious beliefs by allowing their children to read the books and violated their children's religious beliefs by requiring the children to read them. Id. at 1060. The court, however, found that exposure to ideas through the required reading of books did not constitute a constitutionally significant burden on the plaintiffs' free exercise of religion. Id. at 1065. In so holding, the court emphasized that "the evil prohibited by the Free Exercise Clause" is "governmental compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion," and reading or even discussing the books did not compel such action or affirmation. Id. at 1066, 1069.

13

In the present case, the Cobles claim that the potential exposure of their son to The Poet X violates the Free Exercise Clause because it violates JHC's religious beliefs. But this claim ignores the fact that JHC was not required to read The Poet X. Rather, LNC offered an alternative to the book. (Doc. No. 1 at ¶ 58). LNC's offer of an alternative text tends to establish that LNC has done nothing to burden JHC's religious practices. In Grove, the Court noted that the student was provided an alternative book and excused from classroom discussions once she objected to The Learning Tree. 753 F.2d at 1533. The Court held that there was no coercion, especially when balanced against "the critical threat" to the importance of "providing well-rounded public education" to students. Id. at 1534. Courts have also noted that while parents may fear indoctrination, "the mere fact that a child is exposed on occasion in public school to a concept offensive to a parent's religious belief does not inhibit the parent from instructing the child differently." Parker, 514 F.3d at 105; see also Mozert, 827 F.2d 1058 (6th Cir. 1987).

Here, the Cobles fail to allege any facts that support the idea that JHC experienced any coercion regarding his religious beliefs. Instead, the Cobles in their own Complaint have presented facts that tend to show LNC worked to ensure that students would not be forced to read a book that violated their religious beliefs.

In short, the Cobles have not raised factual allegations sufficient to maintain a free exercise claim in this case.

**ORDER**

**IT IS, THEREFORE, ORDERED** that Defendant's motion to dismiss on mootness grounds, Doc. No. 17, is **DENIED** but Defendant's motion to dismiss for failure to state a claim, Doc. No. 17, is **GRANTED.**

Signed: March 22, 2021

Max O. Cogburn Jr
United States District Judge

15